**UNITED STATES DISTRICT COURT**

**DISTRICT OF CONNECTICUT**

---

| | | |
|---|---|---|
| **HUMBERTO CASTRO-CRUZ,** | : | |
| **Plaintiff,** | : | |
| | : | **Civil Action No. ______________** |
| **v.** | : | |
| | : | |
| **Dr. WILFREDO NIEVES,** | : | |
| **JOSEPHINE AGNELLO-VELEY,** | : | |
| **MARK OJAKIAN,** | : | |
| **Dr. TERRENCE CHENG,** | : | |
| **Dr. DUNCAN G. HARRIS,** | : | |
| **PAULA DEBARRROS (MARTIN)** | : | |
| **CAPITAL COMMUNITY COLLEGE** | : | |
| **THE BOARD OF REGENTS FOR** | : | |
| **THE CONNECTICUT STATE COLLEGES** | : | |
| **& UNIVERSITIES,** | : | JUL 14 2025 PM1:28 FILED-USDC-CT-HARTFORD |
| **Dr. JOSÉ COLÓN-RIVAS,** | : | |
| **ARUNAN ARULAMPALAM,** | : | |
| **KRISTINA BALDWIN,** | : | |
| **CRAIG TRUJILLO,** | : | |
| **THE CITY OF HARTFORD,** | : | |
| **ROBERT MOLLER,** | : | |
| **TANYA HUGHES,** | : | |
| **COMMISSION ON HUMAN RIGHTS** | : | |
| **& OPPORTUNITIES (CHRO),** | : | |
| **SHANNON WALSH,** | : | |
| **MARK WASIELEWSKI,** | : | |
| **THE CONNECTICUT OFFICE OF STATE ETHICS,** | : | |
| **BETH BYE,** | : | |
| **THE STATE OFFICE OF EARLY CHILDHOOD,** | : | |
| **FRANK CASSETTA,** | : | |
| **SARAH SKUBAS,** | : | |
| **THE STATE BOARD OF LABOR RELATIONS** | : | |
| **BRIAN BONINA,** | : | |
| **WAYNETTE ARNUM** | : | |
| **SETH FREEMAN** | : | |
| **THE CONGRESS OF CT COMMUNITY** | : | |
| **COLLEGES-SEIU-1973** | : | **JULY, 11, 2025** |

**Defendants.**

---

# COMPLAINT

1. Plaintiff **Humberto Castro-Cruz**, an artist and former college professor committed to public service and community engagement, respectfully brings this civil action for **retaliation, defamation, and violations of constitutional rights** pursuant to **Title VII, 42 U.S.C. §§ 1983 and 1985(3)**, as well as other related statutory claims. These violations arise from a **longstanding pattern of institutional abuse, systematic retaliation, obstruction of due process, suppression of free speech, defamation and coordinated and conspiratorial cover-ups intended to conceal acts of corruption harmful to taxpayers and to both the state and federal governments**, all committed by state and municipal officials and agencies within the State of Connecticut.

2. Plaintiff seeks **compensatory and punitive damages in the amount of $1.5 million**, as well as **declaratory and injunctive relief** to address the ongoing harm and systemic misconduct set forth in this Complaint.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction over this action pursuant to **28 U.S.C. § 1331** (federal question), **28 U.S.C. § 1343** (civil rights), and **42 U.S.C. § 2000e-5(f)(3)** (Title VII). The claims arise under the **United States Constitution**, **Title VII of the Civil Rights Act of 1964**, and federal civil rights statutes, including **42 U.S.C. §§ 1983 and 1985(3)**.

4. Plaintiff **Humberto Castro-Cruz** is a **citizen of the United States of America** residing in the State of Connecticut.

5. Defendants include state officials, municipal authorities, public agencies, and individuals acting under color of state law, whose conduct occurred within the **District of Connecticut**.

6. Venue is proper in this Court under **28 U.S.C. § 1391(b)** because all the events or omissions giving rise to the claims occurred within this District, and most Defendants reside or are based in Connecticut.

## PARTIES

7. **Dr. Wilfredo Nieves**, at certain times relevant to this action, was the President of Capital Community College, and is sued in his individual and official capacity, including defamation;

8. **Josephine Agnello-Veley**, at certain times relevant to this action, was the Director of Human Resources and Labor Relations at Capital Community College, and is sued in her individual and official capacity, including defamation;

9. **Mark Ojakian**, at certain times relevant to this action, was the President of the Board of Regents for Higher Education of the Connecticut State Colleges & Universities (CSCU), and is sued in his individual and official capacity;

10. **Dr. Terrence Cheng**, at certain times relevant to this action, was the President of the Board of Regents for Higher Education of the Connecticut State Colleges & Universities (CSCU), and is sued in his individual and official capacity;

11. **Dr. Duncan G. Harris**, at certain times relevant to this action, was the President (Chief Executive Officer) of Capital Community College, and is sued in his individual and official capacity;

12. **Paula DeBarros (Martin)**, at certain times relevant to this action, was the Human Resources and Labor Relations Associate of the Connecticut State Colleges & Universities (CSCU), and is sued in her individual and official capacity, including defamation.

13. **Capital Community College** is a public institution of higher education located in Hartford, Connecticut. It operates under the authority of the Board of Regents for Higher Education as a constituent unit of the Connecticut State Colleges and Universities (CSCU) system and functions as an arm of the State. CCC receives substantial federal funding from the U.S. Department of

Education, including through Title IV financial aid programs, and is designated as a Hispanic-Serving Institution (HSI). At all relevant times, CCC employed several of the individual Defendants named herein and played a central role in the events giving rise to this action. Although immune from damages under 42 U.S.C. § 1983, Plaintiff seeks prospective injunctive relief pursuant to *Ex parte Young* to address continued retaliation, abuse of authority, and deliberate indifference to constitutional violations by CCC administrators and officials.

14. **The Board of Regents for Higher Education of the Connecticut State Colleges and Universities (BOR–CSCU)** is a state entity responsible for governing and overseeing Connecticut's system of public colleges and universities, including Capital Community College. The Board exercises administrative, budgetary, and policy authority over its constituent institutions and is empowered to hire and supervise executive leadership. At all relevant times, the BOR acted under color of state law and either directed, condoned, or exhibited deliberate indifference to the unlawful acts and omissions giving rise to this Complaint. The BOR receives substantial federal funding, including through the U.S. Department of Education. Although the BOR is immune from damages under 42 U.S.C. § 1983 due to Eleventh Amendment sovereign immunity, Plaintiff seeks prospective injunctive and declaratory relief pursuant to *Ex parte Young*, to address ongoing retaliation, due process violations, and systemic misconduct committed by BOR officials.

15. **Dr. Jose Colon-Rivas,** at various relevant times, was the Director of the Department of Children, Families, Youth, and Recreation for the City of Hartford. In that role, he was responsible for approving State contracts with childcare providers and for distributing and overseeing compliance with state and federal funds allocated to early childhood education programs within the City. He also served as the coordinator of The Family Fair, "La Feria de la Familia", an initiative of the Mayor's Office focused on young children and family outreach. Dr. Colón-Rivas acted under color of law and is sued in his individual and official capacities.

16. **Arunan Arulampalam** is the current Mayor of the City of Hartford. At various relevant times, he served as the chief executive of the municipal government, with oversight authority over city departments and officials. He is sued in his official and personal capacities.

17. **Kristina Baldwin**, at various times relevant to this action, is the Director of the Department of Children, Families, Youth, and Recreation for the City of Hartford, specifically overseeing early childhood education programs. In that role, she is responsible for approving state contracts with childcare providers and for distributing and monitoring compliance with state and federal funds allocated to daycare services and early education initiatives within the City. She is sued in her official and personal capacities.

18. **Craig Trujillo**, at all relevant times and continuing to the present, was and remains the Chief Auditor for the City of Hartford. In that capacity, he has been responsible for conducting audits and financial oversight of municipal departments and programs, including those receiving state and federal funds. He is sued in his official and personal capacities.

19. **The City of Hartford** is a municipal government and political subdivision of the State of Connecticut. At all relevant times, the City operated through its departments, agents, and officials—including those responsible for auditing, childcare funding, and community programs—and acted under color of state law. Pursuant to *Monell v. Department of Social Services*, 436 U.S. 658 (1978), the City is liable under 42 U.S.C. § 1983 for constitutional violations resulting from its policies, customs, or deliberate indifference to unlawful conduct by its employees and representatives. The City of Hartford receives substantial federal funding, including through programs administered by the U.S. Department of Education, the U.S. Department of Health and Human Services, and the U.S. Department of Housing and Urban Development. Plaintiff seeks both compensatory and punitive damages, as well as prospective injunctive relief to remedy the ongoing harms and institutional misconduct perpetrated or tolerated by City officials.

20. **Robert Moller** was, at various relevant times, an attorney employed by the Connecticut Commission on Human Rights and Opportunities (CHRO). In 2022-2025, he served as lead counsel representing the CHRO in administrative proceedings involving the Plaintiff. In that capacity, Moller acted under color of state law and, in both his individual and official capacities, participated in, enabled, or failed to prevent unlawful conduct, including the suppression of material evidence, procedural irregularities, and actions that contributed to the denial of Plaintiff's constitutional rights. He is sued under 42 U.S.C. §§ 1983 and 1985(3) in both his personal and official capacities for his direct and ongoing involvement in the events giving rise to this Complaint.

21. **Tanya Hughes** was, at all relevant times, the Executive Director of the Connecticut Commission on Human Rights and Opportunities (CHRO). In that capacity, Hughes acted under color of state law and exercised supervisory authority over CHRO's legal and investigative staff. She was personally informed by Plaintiff of systemic issues within both the investigative processes and the Office of Public Hearings. Despite receiving direct notice, Hughes failed to take corrective action. She is sued in both her individual and official capacities under 42 U.S.C. §§ 1983 and 1985(3) for her personal participation in, or deliberate indifference to, institutional misconduct, including the suppression of evidence, obstruction of due process, and systemic violations of Plaintiff's constitutional rights.

22. **The Connecticut Commission on Human Rights and Opportunities (CHRO)** is a state agency charged with enforcing Connecticut's anti-discrimination laws and ensuring equal opportunity in employment, housing, and public accommodations. At all relevant times, CHRO acted under color of state law and either directed, condoned, or exhibited deliberate indifference to the unlawful acts and omissions giving rise to this Complaint. The CHRO receives federal funding, including from the U.S. Equal Employment Opportunity Commission (EEOC) and the U.S. Department of Housing and Urban Development (HUD). Although immune from damages in its official capacity, Plaintiff seeks prospective injunctive and declaratory relief pursuant to *Ex parte*

*Young* to redress ongoing retaliation, due process violations, and systemic investigative misconduct committed by various CHRO officials.

23. **Shannon Walsh** was, at all relevant times, an attorney for the Connecticut Board of Regents for Higher Education (BOR–CSCU). Acting under color of state law, Walsh conspired with other BOR employees to provide false and misleading statements to the Connecticut Commission on Human Rights and Opportunities (CHRO), invoked non-existent BOR policies to justify unlawful actions, and attempted to prevent other BOR employees from testifying truthfully in administrative proceedings. Between 2022 and 2024, she represented BOR–CSCU in administrative proceedings before CHRO (Attorney Robert Moller). She also personally denied Plaintiff permission to attend a scheduled job interview in retaliation for protected activity. Walsh is sued in both her individual and official capacities under 42 U.S.C. §§ 1983 and 1985(3) for her active role in the deprivation of Plaintiff's constitutional rights and her participation in a broader pattern of retaliatory and obstructive conduct.

24. **Mark Wasielewski** has, at all relevant times since 2019, served as the Chief Enforcement Officer of the Connecticut Office of State Ethics (OSE). In that capacity, Wasielewski acted under color of state law and exercised supervisory and investigative authority over ethics complaints involving public officials and state employees. Despite receiving overwhelming evidence of serious ethical violations, he repeatedly failed or refused to investigate, thereby enabling continued misconduct and undermining the integrity of the agency's oversight function. Wasielewski is sued in both his individual and official capacities under 42 U.S.C. §§ 1983 and 1985(3) for his deliberate indifference to constitutional violations, obstruction of state oversight processes, and participation in a pattern of institutional cover-up and dereliction of duty.

25. **The Connecticut Office of State Ethics (OSE)** is a state agency tasked with enforcing Connecticut's ethics laws and ensuring accountability in the conduct of public officials and employees. At all relevant times, OSE acted under color of state law and either directed,

condoned, or exhibited deliberate indifference to the unlawful acts and omissions giving rise to this Complaint. The OSE receives federal support for transparency and ethics enforcement initiatives. Although immune from damages in its official capacity, Plaintiff seeks prospective injunctive and declaratory relief pursuant to *Ex parte Young* to remedy continued failures to investigate credible ethics violations, retaliatory inaction, and systemic misconduct by OSE personnel.

26. **Beth Bye** has, at all relevant times since January 2019, served as the Commissioner of the Connecticut Office of Early Childhood (OEC). In that capacity, Bye acted under color of state law and exercised oversight authority over the administration and regulation of early childhood programs across Connecticut, including those in the City of Hartford that received substantial state and federal funding. Despite receiving documented reports and evidence of fraud, mismanagement, and potential misuse of funds within those programs from 2019 to present, Bye knowingly failed to initiate appropriate investigations or corrective action. Her inaction contributed to the continuation of institutional misconduct and deprived Plaintiff of avenues for redress. Bye is sued in both her individual and official capacities under 42 U.S.C. §§ 1983 and 1985(3) for her deliberate indifference to constitutional violations, failure to act on credible reports of corruption, and participation in a broader pattern of coordinated neglect and retaliation.

27. **The Connecticut Office of Early Childhood (OEC)** is a state agency responsible for the administration, licensing, and oversight of early childhood programs across the state, including those funded by state and federal sources. At all relevant times, OEC acted under color of state law and either directed, condoned, or exhibited deliberate indifference to the unlawful acts and omissions giving rise to this Complaint. The OEC receives substantial federal funding, including through the U.S. Department of Health and Human Services and the U.S. Department of Education. Although immune from damages in its official capacity, Plaintiff seeks prospective

injunctive and declaratory relief pursuant to *Ex parte Young* to address permanent, continued and flagrant regulatory failures, retaliation, and institutional cover-ups perpetrated by OEC officials.

28. **Frank Cassetta** was, at all relevant times, the Chief Legal Counsel for the Connecticut State Board of Labor Relations (SBLR). Acting under color of state law and in both his individual and official capacities, Cassetta played a central role in suppressing exculpatory evidence, denying Plaintiff the opportunity to secure witness testimony, tolerating perjury, and accepting fabricated documents as legitimate submissions in quasi-judicial proceedings. Despite being repeatedly notified that certain handwritten letters were defamatory forgeries, Cassetta republished them verbatim in the SBLR's official ruling of December 2023, thereby further defaming the Plaintiff. He subsequently refused to correct or remove the false material from the public record, knowing it continued to cause harm. Cassetta is sued under 42 U.S.C. §§ 1983 and 1985(3) for his personal involvement in the violation of Plaintiff's constitutional rights and for enabling institutional retaliation, abuse of authority, defamation and reputational harm through deliberate misconduct.

29. **The Connecticut State Board of Labor Relations (SBLR)** is a state administrative agency responsible for enforcing labor statutes and adjudicating disputes involving public employees and employers in the State of Connecticut. At all relevant times, the SBLR acted under color of state law and, through its officers, legal counsel, and procedures, directly participated in or exhibited deliberate indifference toward unlawful acts, including retaliation, suppression of evidence, and violations of constitutional rights. The SBLR is a recipient of state and federal funding and is obligated to uphold the constitutional and statutory rights of those appearing before it. Although the SBLR is immune from damages in its official capacity, Plaintiff seeks prospective declaratory and injunctive relief pursuant to *Ex parte Young* to remedy ongoing misconduct and continuing violations of 42 U.S.C. §§ 1983 and 1985(3).

30. **Sarah Skubas** was, at all relevant times, an attorney at the law firm Jackson Lewis P.C., acting under color of state law as legal counsel for the Connecticut Board of Regents for Higher

Education (BOR–CSCU) in proceedings before the Connecticut State Board of Labor Relations (SBLR) during 2022–2023. In that capacity, Skubas submitted fabricated and defamatory handwritten letters as evidence against the Plaintiff. After introducing the forged documents into the official record, she was repeatedly informed that the letters were falsified and defamatory, yet she deliberately refused to remove them or seek their exclusion from the proceedings. By permitting their continued use and incorporation into the final ruling of the SBLR, she enabled and aggravated the republication of knowingly false and damaging statements. Skubas is sued under 42 U.S.C. §§ 1983 and 1985(3), as well as under Connecticut state defamation law, for her active role in furthering a retaliatory conspiracy, her conscious disregard for the truth, and her personal participation in depriving Plaintiff of constitutional rights, due process, and professional reputation through the use of fabricated evidence.

31. **Brian Bonina** was, at various times relevant to this action, the President of the Congress of Connecticut Community Colleges (4Cs Union), serving from 2015 to 2021. Acting under color of state law in his capacity as a union leader representing public employees, Bonina conspired with senior administrators at Capital Community College to deny the Plaintiff union representation and protection, in violation of the collective bargaining agreement and applicable labor statutes. This denial of representation and related acts of retaliation were in response to a public article authored by Plaintiff and published in *The Connecticut Mirror*, which was critical of the 4Cs Union's leadership and conduct. Bonina is sued in both his individual and official capacities under 42 U.S.C. §§ 1983 and 1985(3) for his direct involvement in retaliatory conduct, suppression of Plaintiff's rights under the collective bargaining framework, and participation in a broader conspiracy to silence whistleblowing and criticism of institutional misconduct.

32. **Waynette Arnum** Waynette Arnum, acting under color of state law in her dual role as union representative and member of the college's Sexual Misconduct and Abuse Prevention Committee, was fully aware of the false and defamatory accusations against Plaintiff and failed to act to ensure

his representation or safeguard his rights under the collective bargaining agreement. Instead, she colluded with college officials to sustain retaliatory measures and a hostile environment despite the absence of any evidence that Plaintiff posed a threat. Arnum is sued under 42 U.S.C. §§ 1983 and 1985(3) for her deliberate indifference, failure to intervene, and participation in a broader pattern of union complicity in institutional retaliation.

33. **Seth Freeman**, acting under color of state law, was elected President of the Congress of Connecticut Community Colleges (4Cs Union) in January 2021. From 2016 to 2018, he was also a faculty colleague of the Plaintiff and part of a larger group of employees concerned with institutional abuses. Although Freeman initially expressed support for Plaintiff's position before the Connecticut State Board of Labor Relations (SBLR), he later withdrew that support without justification. This shift effectively aligned the union with college management and contributed to the Plaintiff's further isolation and exposure to retaliatory litigation tactics. Freeman is sued under 42 U.S.C. §§ 1983 and 1985(3), in both his individual and official capacities, for his participation in the broader pattern of union complicity in retaliation and his failure to uphold the union's duty of fair representation.

34. **The Congress of Connecticut Community Colleges (4Cs – SEIU Local 1973)** is a labor organization and the exclusive collective bargaining representative for full-time faculty and professional staff at Connecticut's community colleges. At all relevant times, the 4Cs acted under color of state law through its officers, attorneys, and campus representatives, and was responsible for representing the Plaintiff pursuant to the collective bargaining agreement (CBA). The 4Cs is sued under 42 U.S.C. §§ 1983 and 1985(3), for breach of its duty of fair representation under *Vaca v. Sipes*, 386 U.S. 171 (1967), and for defamation arising from its knowing or reckless participation in the introduction and validation of fabricated and defamatory evidence. Its actions enabled and perpetuated retaliatory and discriminatory conduct in collusion with institutional actors, in violation of Plaintiff's constitutional and contractual rights.

**PRELIMINARY BACKGROUND: PROFESSIONAL TRAJECTORY AND EARLY CONTEXT OF RETALIATION**

35. The Plaintiff came to Connecticut in 2000 and immediately began working as a teacher in various schools and as an artist, creating community mural projects with different organizations. Sometime later, the Plaintiff was hired by Dr. José Colón-Rivas, Director of the Department of Children, Families, Youth & Recreation of the Hartford Mayor's Office, to lead large-scale mural art projects during the annual Family Fair, in collaboration with families and children attending the event.

36. In January 2005, the Plaintiff was employed as an Adjunct Professor in the Humanities Department at Capital Community College, where he taught courses in Art History, Art Appreciation, Caribbean Art & Culture, and Spanish Language. His wife, Miriam Mercado, was also employed at the College as the Coordinator of the Child Development Associate Credential Program (CDA), College Liaison to the Early Childhood Sector in the Greater Hartford Area, and Professor of Early Childhood Education.

37. In 2007, the Plaintiff received a statewide award from Governor Jodi Rell and Secretary of State Susan Bysiewicz after being chosen by *Identidad Latina* newspaper as the most outstanding Latino artist of the year for his contributions to the community.

38. That same year, Professor Mercado was awarded a contract through the State School Readiness Program to open a private preschool academy for 72 children. The award was granted by Dr. Colón-Rivas, since the City of Hartford acted as the pass-through entity. The original idea was that Plaintiff would help develop a unique model of a bilingual preschool academy based on the visual arts.

39. In November 2007, Mercado established Pequeñín Children Multicultural Readiness Academy, LLC, as sole proprietor. The Academy opened its doors in October 2008. The Plaintiff

was employed there and contributed not only with his art program but also performed logistical and supervisory tasks. However, he had no authority over financial matters, which Mercado placed under the control of MacKeena & Associates, with legal representation by former Superior Court Judge Paul Ridgeway. After a period under Accounting Resources, LLC, Mercado retained CPA Miguel Correa of Sunrise Accounting and Taxation Services. The finances of the academy were subject to regular oversight by the City, particularly by Jane Crowell, Assistant Director of Children's Services under Colón-Rivas. From inception until 2015, annual audits were performed by Kimberly Nardone of CohnReznick, as required by state regulations.

40. In 2014, the Plaintiff and Mercado amicably agreed to divorce without litigation or division of assets. The Plaintiff only requested to retain his employment in the children's art program at the Academy. It was shortly thereafter that the Plaintiff's ordeal began, triggering a long chain of institutional retaliation.

41. In accordance with Federal Rule of Civil Procedure 8(a)(2), which requires a "short and plain statement of the claim showing that the pleader is entitled to relief," the Plaintiff offers this factual background as context. To maintain clarity and preserve critical detail, the Plaintiff will also submit a more detailed chronological timeline as an Exhibit following the Court's acceptance of the Complaint, pursuant to Federal Rule of Civil Procedure 10(c), which provides that "a copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes." Accordingly, once filed, that Exhibit will be incorporated by reference and deemed part of this Complaint.

**STATEMENT OF FACTS –: RETALIATION AT GATEWAY COMMUNITY COLLEGE (2021-2025)**

42. The retaliatory incident that occurred in 2021 at Gateway Community College represents not an isolated act, but rather a continuation of a longstanding pattern of retaliation orchestrated by the Board of Regents for Higher Education (BOR–CSCU), in coordination with the Connecticut

Commission on Human Rights and Opportunities (CHRO), whose agents consistently demonstrated institutional incompetence and favoritism toward another state agency.

43. In October 25, 2021, the Complainant was selected as a finalist for a full-time position at Gateway Community College based on his credentials and prior teaching record. However, despite this official selection, the Complainant was denied permission to attend the job interview. Such permission was procedurally required due to the existence of an active arrest warrant that had been issued against him—based on prior retaliatory acts—should he enter any campus of the CSCU system without prior authorization.

44. On February 2022, the Complainant filled a new CHRO Complaint.

45. Rather than acknowledge this barrier, the CHRO Investigator permitted the Respondent to submit blatantly false statements under oath. Specifically, the Respondent falsely testified that the Complainant "had called the recruiter and withdrawn from the process." This falsehood remained uncorrected for several months until the Complainant threatened to file a defamation-by-implication suit, and to report the conduct to the Chief State's Attorney for perjury and submission of knowingly false statements during an official CHRO investigation. Only then did the Respondent retract its misrepresentation.

46. Moreover, BOR–CSCU Attorney Shannon Walsh explicitly admitted that she had informed Gateway Supervisor Eisenbach that the Complainant was "ineligible for rehire" due to a prior termination "for just cause." This assertion was knowingly false and unsupported by any policy or written rule. In fact, not only does no such policy exist within the BOR–CSCU system, but a prior CHRO investigator—Attorney Renee Vanden Wall Bake—had already ruled in January 2014 that the termination of the Complainant was unjustified and retaliatory.

47. Despite having knowledge of this prior determination, CHRO Attorney Moller ignored that binding precedent. He failed to require the Respondent to produce a single document or policy

proving any rule of ineligibility, and disregarded multiple documents submitted by the Complainant, including evidence that CCC HR Director Josephine Agnello-Veley—the same official who executed the 2018 termination—allowed the Complainant to apply for a full-time position at Capital in 2019. If a legitimate rehire ban had existed, such application would have been categorically rejected. The Respondent never explained how the Complainant was considered eligible in 2019 but suddenly ineligible in 2021.

48. Attorney Moller also permitted the Respondent to continue without presenting a single comparator—i.e., any other former employee who had been subject to this supposed "policy." This omission was especially egregious, given that the Respondent is an Equal Employment Opportunity (EEO) institution that accepts job applications from candidates with criminal records.

49. In addition, Attorney Moller ignored critical evidence previously submitted by the Complainant: (1) the forged handwritten letters fabricated by Professor Miriam Mercado, which constituted the basis of the false "danger" narrative surrounding the Complainant; (2) multiple whistleblower reports filed by the Complainant involving academic corruption and misuse of public funds, which directly triggered the adverse employment actions taken against him; and (3) documented cases of disparate discipline within the CSCU system, including the reinstatement of Daniel Tauber (after misuse of College computer systems) and Christopher Dukes (after violent behavior), both of whom received back pay and were restored to their positions.

50. Multiple requests for Reconsideration of 2024 were ignored.

51. On June 6, 2024, an Administrative Appeal under CGS Sec. 4-183 was dismissed because the Plaintiff had not exhausted the administrative remedies and the decision was not considered final, then the Plaintiff requested again a Reconsideration.

52. The CHRO's Reopening Request process in this matter, concluded on May 15, 2025, was a procedural farce. One of the CHRO Commissioners who voted to deny reconsideration was

Attorney Tamara Titre—the same attorney who had ruled against the Complainant in a State Labor Board proceeding between 2021 and 2023. Despite this flagrant and disqualifying conflict of interest, Attorney Titre did not recuse herself from voting.

53. On April 15, 2025, the Complainant was issued a Right to Sue Letter by the U.S. Equal Employment Opportunity Commission (EEOC), empowering him to pursue relief in federal court for the retaliation, procedural abuse, and civil rights violations committed under color of state law by CHRO and BOR–CSCU officials in connection with the Gateway Community College process.

**COUNT 1: TITLE VII – RETALIATION FACILITATED BY THE BOARD OF REGENTS FOR HIGHER EDUCATION (BOR–CSCU) AND ATTORNEY SHANNON WALSH**

54. The Board of Regents for Higher Education (BOR–CSCU), through the deliberate actions of Attorney Shannon Walsh, violated Title VII of the Civil Rights Act of 1964 by retaliating against the Plaintiff for engaging in protected activities, including filing a formal Discrimination Complaint with the CHRO and reporting systemic academic corruption and misuse of public funds. Despite being selected as a finalist for a position at Gateway Community College, the Plaintiff was denied permission to attend the job interview due to an active arrest warrant, a direct consequence of prior retaliatory acts orchestrated by BOR–CSCU officials. This denial of employment opportunity, coupled with the false statements made by the Respondent during the CHRO investigation, constitutes a clear violation of the Plaintiff's rights under Title VII.

**COUNT 2: VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983 – BOARD OF REGENTS FOR HIGHER EDUCATION (BOR–CSCU), ATTORNEY SHANNON WALSH, AND SUPERVISOR THERESA EISENBACH**

55. Attorney Shannon Walsh, Supervisor Theresa Eisenbach, and the Board of Regents for Higher Education (BOR–CSCU), acting under color of state law, deprived the Plaintiff of his constitutional rights, including the right to petition the government for redress and the right to due

process and equal protection. Despite overwhelming evidence of retaliatory conduct and misuse of public funds, these officials repeatedly disregarded evidence, allowed false statements to stand, and obstructed efforts to investigate the Plaintiff's claims. By enabling retaliatory actions, failing to investigate claims of workplace misconduct, and shielding powerful state actors from accountability, they violated the Plaintiff's rights under 42 U.S.C. § 1983.

**COUNT 3: CONSPIRACY TO VIOLATE CIVIL RIGHTS UNDER 42 U.S.C. § 1985(3) – BOARD OF REGENTS FOR HIGHER EDUCATION (BOR–CSCU), ATTORNEY SHANNON WALSH, SUPERVISOR THERESA EISENBACH, AND CHRO INVESTIGATOR ROBERT MOLLER**

56. Attorney Shannon Walsh, Supervisor Theresa Eisenbach, CHRO Investigator Moller, and other state officials, acting in concert, conspired to obstruct the Plaintiff's access to fair and impartial review and retaliated against the Plaintiff for exercising his rights as a whistleblower. This conspiracy involved the suppression of critical investigations, submission of false statements under oath, and protection of colleagues from legal scrutiny. By denying the Plaintiff due process and failing to hold wrongdoers accountable, these officials engaged in a pattern of intentional deprivation of rights, as prohibited under 42 U.S.C. § 1985(3).

**STATEMENT OF FACTS: DISCRIMINATION BASED ON SEX, DUE PROCESS DENIAL, RETALIATION- 2015-2022**

57. Since 2015, the Plaintiff began experiencing unexplained cancellations of his classes at Capital Community College, resulting in direct economic harm. Two colleagues whom he had personally recommended for employment and who taught the same subjects earned, on average, $35,000 more annually due to those cancellations. Simultaneously, since 2014, colleagues with whom he had always maintained cordial relations became distant or hostile without apparent cause. At that time, lacking sufficient evidence and after consulting with Department Chair Dr. Partridge, the Plaintiff decided not to file a formal complaint.

58. In August 2015, Professor Miriam Mercado fired her assistant, Luisa Rivera, falsely accusing her of workplace violence after conspiring with other employees to install a hidden device that recorded critical comments about her leadership. Shortly thereafter, Ms. Rivera filed formal complaints with the City of Hartford, the Office of Early Childhood, and College President Wilfredo Nieves, denouncing Mercado for misusing state funds—specifically, hiring college students and operating a private preschool during state time using public resources.

59. These complaints triggered internal investigations, which were actively obstructed by President Nieves and municipal official José Colón-Rivas, both of whom had a vested interest in covering up the violations. The Plaintiff cooperated fully with investigators and was falsely accused of having instigated or co-authored the complaints—an allegation never substantiated in either of the two hearings held in November 2018 and June 2019. The Plaintiff only learned of this accusation in April 2018, upon receiving the dismissal report.

60. In September 2016, he was exonerated in a Department of Children and Families (DCF) investigation into alleged violent behavior toward children and families at Mercado's preschool, after multiple coworkers submitted sworn statements confirming the accusations were false.

61. That same month, after nearly a year of canceled assignments, the Plaintiff returned to teaching. He was invited by Program Director Dr. Linda Domenitz to join the "Compassion Project," unaware that Mercado was also involved. When Mercado discovered that the Plaintiff was seeking external funding for a community art project similar to those she had previously led, she accused him of harassment and intimidation without presenting any evidence.

62. As a result of those unfounded accusations, President Nieves and Human Resources Director Josephine Agnello-Veley imposed a humiliating daily police surveillance protocol, without initiating an investigation or allowing the Plaintiff to defend himself. This surveillance occurred in front of students and colleagues and continued until his suspension in October 2017.

63. In November 2016, Mercado attended a Compassion Project meeting accompanied by President Nieves and College Chief of Police James Griffin. The next day, she asked Dr. Domenitz to support her request for the Plaintiff's dismissal. When Dr. Domenitz refused, Mercado insulted her and resigned from the project. Facing mounting pressure from colleagues, the Plaintiff voluntarily withdrew from the project to prevent further harm to Dr. Domenitz.

64. On December 14, 2016, the Plaintiff formally requested that Human Resources investigate the accusations against him. He also warned of Mercado's documented history of false allegations. In a December 19 response, Agnello-Veley falsely claimed she was unaware of any complaints, stating there were no administrative records and that the surveillance was part of "routine duties." The Plaintiff then contacted Union Representative Dr. Greg Jackson.

65. The actions taken by Nieves and Agnello-Veley violated multiple laws and policies, including Title VII, Title IX, the Jeanne Clery Act, the Violence Against Women Act (VAWA), Connecticut Public Act 14-11 on campus domestic violence and harassment, and the State's 1999 Workplace Violence Policy.

66. In January 2017, Union Representative Dr. Greg Jackson formally requested access to the College's Daily Crime Log, as required by the Jeanne Clery Act and VAWA. The request was denied by the College Chief of Police and Dean of Administration, Lester Primus, despite federal law requiring public access to such records. Dr. Jackson filed a complaint with Steven Weinberger, Vice President for Human Resources at the Board of Regents (BOR), who, rather than ordering the release of the records, suggested that Dr. Jackson file a Freedom of Information Act (FOIA) complaint.

67. On April 4, 2017, faced with the College administration's refusal to cooperate, the Plaintiff filed a formal discrimination complaint with the CHRO (No. 1710454 – EEOC 16A 2017-00955), as well as a complaint with the Office of State Ethics.

68. On April 18, 2017, Vice President Steven Weinberger visited Capital Community College in response to an unprecedented number of simultaneous complaints from faculty and staff against the administration. When he asked the Plaintiff why, if he had not harassed Professor Mercado, she continued to accuse him, the Plaintiff explained that Mercado's fear that he might expose serious BOR policy violations—such as hiring CDA students and running a private company with state funds during official hours—was the only plausible motive behind the accusations. Weinberger never fulfilled his promise to return to the College with a formal response to the complainants.

69. That same day, April 18, 2017, the Plaintiff published an op-ed article in *The CT Mirror* titled "Change or Die: A Look at the Other Side of the Truth," criticizing President Ojakian's consolidation plan and highlighting systemic problems within the CSCU system, particularly at Capital. 4Cs Union President Brian Bonina reacted with alarm and falsely accused Dr. Jackson of having encouraged the Plaintiff to write the piece. Although the article used the term "death" several times, it did so in a figurative and policy-critical context. No reader expressed concern or interpreted the content as threatening.

70. On May 18, 2017, the Plaintiff emailed a letter to BOR–CSCU President Mark Ojakian denouncing the abuses and unethical practices at the College as the root cause of the retaliation he faced. President Ojakian never responded. Nearly a year later, on April 19, 2018, when the Plaintiff received the documents justifying his termination, he learned that Ojakian had forwarded the letter to the very individuals responsible for the retaliation, which only intensified the hostile work environment.

71. On May 23, 2017, the Plaintiff requested intervention from Mr. Michael Foreman, Human Resources Officer for the BOR at the Connecticut Department of Administrative Services, responsible for implementing the State's Workplace Violence Policy. Mr. Foreman replied that, since the complaint was pending before the CHRO, he could not intervene.

72. On June 14, 2017, the Board of Regents and Capital Community College submitted a joint response to the CHRO. In that response, HR Director Josephine Agnello-Veley admitted that she had lied in her December 19, 2016 statement regarding the existence of complaints against the Plaintiff, but continued making false claims about the conduct of the College police officers.

73. On June 27, 2017, union representatives at Capital sent a letter to SEIU President Mary Kay Henry (representing over two million members), denouncing the unprecedented number of complaints, the BOR's silence, the retaliation against Dr. Jackson, and the corrupt collusion between 4Cs President Brian Bonina and College management. The letter was never answered. Shortly afterward, Dr. Jackson's work-issued laptop and cellphone were confiscated, and he was removed from his position at the College. BOR officials continued to ignore the situation, despite the ongoing pattern of flagrant abuse.

74. Following Dr. Jackson's removal, President Bonina never responded to the Plaintiff's requests for union representation. Title IX Coordinator Rita Kelly, who had full jurisdiction over the Plaintiff's case and a legal duty to act, also ignored his requests.

75. Toward the end of June 2017, the Office of State Ethics dismissed the Plaintiff's complaint for "lack of probable cause," despite the abundant evidence submitted.

76. On September 26, 2017, the Plaintiff attended a CHRO mediation hearing. He asked only that the College issue a public apology, end the police surveillance, and engage in serious dialogue with Professor Mercado to put an end to the false accusations. The request was summarily rejected.

77. That same day, the Plaintiff sent an open letter to President Nieves via a college-wide email, criticizing the administration's unfair and destructive handling of his case. The email concluded with the phrase: "Moral integrity is something we must defend to death," in the plural. No College

officer or colleague reacted with concern or interpreted the message as threatening. The Plaintiff continued to work without incident for the next sixteen days.

78. On October 11, 2017, having received no response, the Plaintiff sent a second college-wide email defending his moral integrity and denouncing the academic and institutional corruption behind the false accusations. That same afternoon, President Nieves referenced the "defend to death" phrase—deliberately altering it to the singular "I must defend to death"—and claimed it constituted a death threat. He placed the Plaintiff on administrative leave, blocked access to his college email, and threatened immediate arrest if he stepped onto campus.

79. The Plaintiff's email contained no threatening or violent language. President Nieves intentionally distorted the phrase to portray the Plaintiff as someone willing to kill or die in literal terms, in order to justify retaliatory measures. For Nieves, publicly denouncing administrative incompetence and the abuses suffered by the Plaintiff was deemed "inappropriate use" of the College email system.

80. Around November 15, 2017, BOR HR Associate Paula DeBarros contacted the Plaintiff for an "investigatory interview" at the BOR Central Office. Over the next fifteen days, the Plaintiff sent multiple emails reiterating the same allegations previously submitted to President Ojakian and Vice President Weinberger, attaching supporting documents.

81. On November 30, 2017, the Plaintiff attended the interview with Ms. DeBarros, who never indicated that Capital Community College was leading the investigation. On the contrary, she gave the impression that she was acting on behalf of the BOR Human Resources Vice Presidency, as the College's supervisory authority.

82. During the interview, Ms. DeBarros asked the Plaintiff about his reasons for sending mass emails—emails that contained information he had already submitted to BOR officials. She also tried to gather information about events that the College administration had never explained to

the Plaintiff. However, she failed to disclose that, on October 4, 2017, Professor Mercado had submitted a sworn statement to Human Resources with graphic and detailed allegations of physical and mental abuse, harassment, intimidation, and her alleged fear that the Plaintiff might attack or even kill her.

83. At the end of the interview, Ms. DeBarros asked what the Plaintiff thought could be done to resolve the situation. He replied that he simply wanted a public apology, an end to the false accusations and police intimidation, and to be reinstated to his teaching position. DeBarros said she would call him "in two or three days." That call never came. Because the interview was not recorded, the Plaintiff followed up with a detailed email summarizing the conversation.

84. A few days later, on December 4, 2017, the Plaintiff sent another email to Ojakian, Weinberger, and DeBarros reiterating his position, the complaints he had filed, and his willingness to return to work.

85. At the end of 2017, the Plaintiff was selected by popular vote for a mural contract in Hartford as part of the *Hartford Paints the City* project, which was even featured in the *Hartford Courant*. Although he was paid both the initial deposit and the final payment, Colón-Rivas never responded to the Plaintiff's requests to make arrangements for the installation of the mural on the facade of the Burns School in Hartford. To this day, the mural remains stored away in a storage unit.

86. On January 12, 2018, although the Art Appreciation class that the Plaintiff regularly taught each semester had already reached 11 registered students, the class was cancelled. Upon discovering the cancellation, the Plaintiff contacted BOR Human Resources Associate Paula DeBarros, who responded that "the College would contact you."

87. The response came via email from the Chair of the Humanities Department, Dr. Partridge. In his message, Dr. Partridge explained that the class, along with approximately 50 others, had been cancelled due to budgetary reasons in order to give students the opportunity to select other

electives. He also noted that President Wilfredo Nieves had informed him that the Plaintiff was "in fact cleared to teach." The Plaintiff questioned the meaning of being "cleared to teach" if no contract had ever been issued, his name had not appeared on the schedule, and Capital was the only college in Connecticut cancelling classes. The Plaintiff further pointed out that the cancelled class had 11 students registered, while classes with as few as 10 students typically proceeded.

88. Dr. Partridge agreed with the Plaintiff and assured him that he would be scheduled to teach during the Summer and Fall semesters.

89. On January 12, Paula DeBarros confirmed that she had known that the President had cleared the Plaintiff to teach, which she confirmed again in an email of January 18. She later contradicted herself in a 2022 hearing of the State Labor Board and said that she had known that through the Plaintiff, which is false. DeBarros also said that it was not her, but Agnello-Veley who was in charge of the investigation, which meant that Agnello was investigating herself.

90. On March 16, 2018, after the Summer and Fall course schedules were published and the Plaintiff's name was not included in the teaching roster, nor had he received a contract, he emailed Dr. Partridge to inquire about the promised class.

91. On March 19, 2018, Dr. Partridge responded and explained that he had been directed by College Management not to assign any courses to the Plaintiff due to the latter's conduct during the previous fall semester. Dr. Partridge stated he was in limbo and awaiting further instructions, which explained his lack of prior communication.

92. On March 26, 2018, the Plaintiff emailed President Nieves, questioning why, if the President had stated that he was "in fact cleared to teach," no contract had been issued in accordance with the Collective Bargaining Agreement and BOR policy. He also asked why the Art Appreciation class had been cancelled, why his name had never appeared on the online teaching roster, and

why he had been excluded from teaching in both the Summer and Fall. The Plaintiff attached a screenshot of the schedule showing the absence of his name.

93. On April 4, 2018, President Nieves sent the Plaintiff a Letter of Dismissal, alleging that he had violated the State Email System Acceptable Use Policy by using the system for "personal matters." Additionally, the letter claimed the Plaintiff had violated the State Workplace Violence Prevention Policy due to the "strong, excessive" tone of his emails sent on September 26 and October 11, 2017, which, according to the administration, "raised safety concerns given the situation." President Nieves referenced a "jointly conducted investigation" by BOR Human Resources and Capital Community College, which had allegedly been reviewed by the Threat Assessment Team (TAT).

94. Up to that point, the Plaintiff was unaware that the TAT had convened. President Nieves did not clarify how a TAT meeting purportedly held on October 11, 2017, could have reviewed an investigation that only occurred later during the November 30, 2017 investigatory interview.

Between April 4 and April 12, 2018, the Plaintiff made repeated efforts to obtain all documentation related to his dismissal from the College's Human Resources Director. The Director did not respond.

95. On April 12, 2018, the Plaintiff sent an email response to President Wilfredo Nieves, with copies to President Mark Ojakian, Vice President Steven Weinberger, and the Chair of the Humanities Department. In that message, the Plaintiff questioned, among other points, how the justifications outlined in the Termination Letter aligned with President Nieves's prior statement from January that the Plaintiff was "in fact cleared to teach." President Nieves did not respond.

96. Since neither President Nieves nor the Human Resources Director had sent the requested documents or responded to the April 12 letter, the Plaintiff contacted CHRO Attorney Yvonne Duncan, who was assigned as the investigator in the Plaintiff's Discrimination Complaint, and

requested her intervention. Because a Fact-Finding Hearing was scheduled for April 25, the HR Director eventually sent the requested documentation on April 19, 2018.

97. It was then that the Plaintiff discovered that Professor Miriam Mercado had submitted an affidavit to Human Resources on October 4, 2017, containing serious allegations of physical and psychological abuse against him. He also learned that the Threat Assessment Team (TAT) had convened on October 11, 2017, and that its members had clear conflicts of interest and were heavily biased against him. Moreover, the Plaintiff learned that the College police had never been deactivated from following him and escorting Professor Mercado, despite the lack of any real threat.

98. The HR Director's "Investigative Report" also stated that Union Representative Waynnette Arnum assisted Professor Mercado in submitting the affidavit and had declined to support the Plaintiff in part because she believed he had lied about the hiring of CDA students in order to damage Professor Mercado's reputation. Ms. Agnello-Veley again deliberately misrepresented facts, falsely asserting that College records indicated that Professor Mercado had always obtained permission from the institution to operate her private business and had never hired active CDA students. It appeared that Ms. Arnum accepted those claims.

99. Regarding the Human Resources Investigative Report, the Plaintiff questioned how a report supposedly written in October—yet undated—could refer to the BOR Investigatory Interview that took place in November, and how the TAT could have evaluated the results of that interview and the rest of the so-called investigation, when the TAT never reconvened and the Plaintiff had not committed any further violations nor returned to the College.

100. As for Professor Mercado's affidavit, the Plaintiff questioned how, on October 4, 2017, she could have claimed to be terrified by an email that was not sent until October 11—seven days later. These glaring inconsistencies suggested that the documents were not drafted on the dates

they claimed and that the TAT meeting may not have occurred as stated. Nevertheless, CHRO Attorney Duncan disregarded these contradictions when the Plaintiff brought them to her attention.

101. The Investigative Report also noted that Professor Mercado intended to bring civil actions against the Plaintiff in Superior Court for contempt and defamation, something she had already begun through her attorney in late 2017. The Plaintiff chose to represent himself and rejected all settlement offers.

102. Importantly, the Investigative Report did not recommend the Plaintiff's dismissal, and this was a core part of the Reasonable Cause Finding of CHRO Attorney Renee Vanden Wall Bake on January 2024, that will be analyzed later.

103. Around May 2018, HR Agnello-Veley provided another Termination Letter stating that Plaintiff had been dismissed on January 12, 2018.

104. Since Attorney Duncan had indicated that an amendment would be required following the April 4, 2018 dismissal, the Plaintiff informed her that, in addition to amending the existing CHRO Complaint, he would also request a new and impartial investigation of his case at the College level, to which Duncan agreed. At no point did Duncan advise the Plaintiff to file a new complaint, nor did she mention any 180-day filing deadline, an issue she later contradicted in 2019. This contradiction remains a key point of litigation in CHRO Case No. 1710454, which is still pending resolution.

105. The Plaintiff provided Attorney Duncan not only with evidence of his complaints to BOR leadership, but also with a photograph published on social media showing Agnello-Veley and DeBarros with Laurie Peters Dunn (DeBarros's supervisor) celebrating Agnello-Veley's birthday on October 24, 2017, two weeks after the Plaintiff was placed on administrative leave and two

weeks before the Plaintiff and DeBarros exchanged emails and made arrangements for the investigatory interview scheduled for November 30, 2017. Duncan ignored this evidence.

106. On October 4, 2018, the Plaintiff sent 13 emails with 99 attachments of supporting evidence to Capital Community College's new President, G. Duncan Harris, and other college officers, with a copy to Attorney Duncan. In those emails, he formally requested a proper investigation into his case. The request was never answered. A few days later, the Plaintiff submitted the Amendment.

107. On November 13, 2018, the College responded to the CHRO, and Josephine Agnello-Veley stated that the Plaintiff had not been discriminated against because he had been offered a class for the Spring Semester of 2018, but it had to be canceled due to low enrollment. This statement was false; the class the Plaintiff was supposed to teach (even though his name was never placed on the teaching roster, nor did President Nieves provide him with a contract ahead of the semester as required by the CBA) already had 11 students enrolled on the day it was canceled. President Nieves would later contradict this in the 2022 SBLR hearing by claiming that Dr. Partridge had lied and that the class had never been intended for the Plaintiff.

108. On November 18, 2018, following the October 25 hearing, the Honorable Margaret Murphy ruled that the Plaintiff had the right to defend himself against false accusations and that doing so did not constitute any form of contempt of the court order. Shortly thereafter, Ms. Mercado filed a new Complaint for Defamation and Slander at Hartford Superior Civil Court, and once again, the Plaintiff chose to represent himself.

109. On January 29, 2019, the Plaintiff submitted a list of witnesses and specific questions for CHRO Attorney Duncan to ask during the investigation. Duncan responded that she would decide whether to interview them at the Fact-Finding Hearing, at another time, or not at all, and would inform the Plaintiff accordingly. In the end, she interviewed only one witness: former union organizer Dr. Greg Jackson.

110. On February 8, 2019, the Plaintiff attended the Fact-Finding Hearing at CHRO alongside HR Director Josephine Agnello-Veley, Assistant Attorney General Matthew Larock, and BOR Attorney Melissa Schwalbach. During the hearing, HR Director Agnello-Veley falsely claimed that former Dean of Administration Lester Primus—rather than herself—had been the officer responsible for Workplace Violence matters and had ordered police surveillance of the Plaintiff and an escort for Professor Mercado. Agnello-Veley also asserted that the Spring 2018 class was canceled to accommodate students close to graduation, a claim the Plaintiff described as demonstrably false due to the constantly shifting nature of registration data. CHRO Attorney Duncan neither asked for evidence to support that claim nor questioned why, if the College truly intended to offer a class, President Nieves never issued a contract as required by the CBA and BOR policy.

111. At the hearing, the Plaintiff learned that Professor Pedro Valentín had left the College, leaving a faculty vacancy. In closing remarks, the Plaintiff stated that the Respondents would not prevail in a federal Title IX suit, given their blatant violations of due process, presumption of innocence, and evidentiary standards. He proposed settling the case if the College agreed to award him that position, given his qualifications—and pay back wages, along with a formal apology. The College representatives agreed to consider the offer and advised him to apply formally, which he did before the March 15, 2019 deadline.

112. After the hearing, the Plaintiff discovered that the Jeanne Clery Act report submitted by Sergeant Griffin for FY 2017 failed to mention any of the violence allegations, TAT proceedings, or the dismissal attributed to violent conduct. Attorney Duncan ignored this omission when the Plaintiff brought it to her attention. In that same communication, the Plaintiff also denounced the so-called "impartial investigation" as a fabrication orchestrated by individuals with close ties to each other, designed to create the false appearance of fairness. Duncan did not respond.

113. In subsequent interactions, the Plaintiff repeatedly asked AAG Matthew Larock why the Office of the Attorney General was ignoring acts of corruption tied to the accusations against him,

including misuse of state and federal funds, double-dipping by state employees, misuse of CDA student identities and credentials to secure public funding, and other irregularities.

114. From February 5 to March 22, 2019, the Plaintiff sent multiple emails to Attorney Larock, with copies to President Harris, each containing attachments and supporting evidence of the violations. Attorney Larock responded only to say that such matters fell under a different jurisdiction and claimed he trusted the outcomes of prior investigations, despite being presented with substantial evidence that those investigations had either been compromised or never conducted.

115. Between February 20 and March 19, 2019, the Plaintiff also sent thirty-four (34) emails to Office of State Ethics Director Carol Carson, containing overwhelming evidence of ethical violations at Capital Community College. Despite the volume, legitimacy, and clarity of the evidence, Director Carson stated that the matter had already been investigated and declined to take further action.

116. On April 30, 2019, the Plaintiff filed a second complaint with the Office of State Ethics, and once again Officer Michael Morrissey was assigned to the investigation. As he had done in 2017, Morrissey was hostile and ended up threatening the Plaintiff, stating that if there had truly been identity theft involving College students, he should go to the Hartford Police.

117. In civil court, Ms. Mercado demanded $150,000 in compensation if the Plaintiff did not admit to having defamed her, which the Plaintiff refused. Simultaneously, intimidating actions began to occur: the Plaintiff's apartment was broken into by forcing the lock, yet nothing of value was stolen; his cars were vandalized, and individuals intimidated the Plaintiff's new wife by simulating chases in traffic. The Hartford Police did not even file a police report, claiming there was no suspect. After Morrissey threats and when shots were fired at the cars, the Plaintiff contacted the FBI.

118. On May 29, 2019, Office of State Ethics Chief Investigator Mark Wasielewski took over the investigation, and once again the Plaintiff provided all evidence in his possession.

119. Around May 1, 2019, the Plaintiff met with FBI Special Agent Ron Offutt and provided him with all documentation in his possession, including evidence of misuse of funds, ethical violations, and academic corruption. Agent Offutt stated that investigating higher education was extremely difficult and not within the FBI's primary jurisdiction, suggesting instead that it was the responsibility of the State of Connecticut to investigate misuse of funds. He referred the Plaintiff back to state authorities, after which the Plaintiff contacted the State Auditors of Public Accounts.

120. From June 5 to August 16, 2019, the Plaintiff sent State Auditor Ramona Weingart two hundred and twenty emails containing all documents in his possession related to the use of funds in Hartford preschool programs, as well as all evidence previously submitted to the Office of State Ethics. These emails were also copied to Agent Offutt, Office of Early Childhood Director Beth Bye, and multiple officials from the City of Hartford, primarily Chief Auditor Craig Trujillo.

121. After Ms. Mercado's attorney learned during a civil court pre-trial conference that the Plaintiff had contacted the FBI, the acts of intimidation ceased.

122. Around June 2019, the HR Director informed all applicants that the Art Faculty position had been filled. The individual selected by the College reportedly lacked even half the credentials and experience held by the Plaintiff. When the Plaintiff raised this concern with Attorney Duncan, she responded that the College had never truly intended to consider the Plaintiff's proposal and openly admitted that they did not want him at Capital.

123. On June 25, 2019, a trial was held in Superior Civil Court regarding the defamation lawsuit referenced by Human Resources Director Josephine Agnello-Veley in her "Investigative Report."

One of the witnesses subpoenaed by Professor Mercado's attorney testified that she had been a student in the CDA program at Capital Community College, where Professor Mercado had been

her instructor. She stated that in 2010, after completing part of her 480 volunteer practicum hours at Professor Mercado's private academy without any compensation, she was hired by Mercado as an employee. The witness further testified that she graduated from the CDA program after passing her final practicum at the same academy in 2012, and noted that several classmates had also been hired under similar circumstances. Additionally, she declared that her sister's personal information and academic credentials—her sister also a graduate of the Capital CDA program—appeared in official reports submitted by Professor Mercado to the Connecticut Office of Early Childhood as if her sister had been employed at the academy, when in fact she never worked there.

124. On October 4, 2019, CHRO Attorney Yvonne Duncan submitted her draft of a preliminary determination of "no reasonable cause for discrimination," which contained multiple serious factual and legal errors.

125. First, Duncan acknowledged that the persecution suffered by the Plaintiff at the hands of the College Police caused him "embarrassment," but concluded that it was not a discriminatory act because the College "had to enforce institutional policy." This statement revealed an absolute lack of understanding of the fundamental principles of presumption of innocence, the standard of preponderance of the evidence, and due process, all of which are expressly established in the State-BOR Policy on Prevention of Workplace Violence and Threat Assessment (2012), as well as in the Jean Clery Act of 1993, VAWA of 1990, Title VII of 1964, and Title IX of 1972.

126. Second, Duncan avoided ruling on the retaliatory dismissal, alleging a supposed expiration of the 180-day deadline, but at the same time accepted the College's argument that the dismissal had been valid because it "generated fear among colleagues," even though there was no evidence whatsoever indicating that the Plaintiff was violent. This conclusion, entirely speculative, constitutes a legal aberration contrary to due process.

127. On November 20, 2019, the Plaintiff submitted a request to Mr. Jason Scappaticci, the new Title IX Coordinator at Capital Community College, asking for a proper investigation. The request was never answered.

128. On November 25, 2019, despite the statute of limitations having expired, the U.S. Department of Education's Office for Civil Rights accepted the Plaintiff's complaint under Title IX of 1972. Officer James Moser interviewed the Plaintiff on December 4, 2019. A few days later, Officer Moser closed the case with the expectation that CHRO would resolve it.

129. In the 2021 fact-finding process, the Respondent's officials made a wide range of statements. Marisol Malave, former Executive Assistant to the Dean of Administration, distanced herself from her previous allegations against the Plaintiff and stated that she had never had anything against him. HR Director Josephine Agnello-Veley admitted that she had harmed the Plaintiff because she herself was going through a divorce at the time, but could not explain whether anything, if at all, had been investigated in relation to the ethical violations reported by the Plaintiff. Chief of Police James Griffin admitted that Mercado had never, not even once, accepted or requested a police escort. However, he falsely claimed he was unaware that his officers had intimidated or followed the Plaintiff around campus daily for 13 consecutive months, since he had not personally issued such an order.

## STATEMENT OF FACTS: – PART II: CHRO AND OPH (2017–2025)

130. From April 4, 2017 to July 10, 2025, the Complainant was subjected to a prolonged and systematic pattern of procedural misconduct, institutional bias, and denial of due process by the Connecticut Commission on Human Rights and Opportunities (CHRO) and its adjudicative body, the Office of Public Hearings (OPH). These failures gravely compromised the Complainant's right to an impartial adjudication under state and federal law, and now constitute sufficient grounds for a federal action pursuant to 42 U.S.C. § 1983 and § 1985.

131. CHRO and OPH consistently ignored overwhelming evidence presented by the Complainant, including detailed documentation about fabricated letters, identity impersonation, retaliatory class cancellations, institutional corruption, and misappropriation of public funds. Despite multiple requests, such evidence was deliberately excluded from the official record, obstructing the impartial evaluation of the Complainant's claims and allowing the continuation of institutional retaliation.

132. Although CHRO validly accepted a First Amendment to the Complaint in 2018 and a Second Amendment formally authorized by OPH in 2022, both amendments were later invalidated under the OPH process of 2015. This retroactive denial not only violated CHRO's own procedural rules, but also eliminated fundamental facts for the proper adjudication of the case, such as the retaliatory termination.

133. Attorney Yvonne Duncan misled the Complainant by instructing him in 2018 to amend the original complaint instead of filing a new one, and later used that same amendment as a basis to assert that his claims were untimely. Duncan suppressed exculpatory evidence, refused to interview key witnesses, validated a retaliatory termination without any investigation, and even threatened the Complainant for continuing to report acts of corruption. When Duncan left CHRO, Attorney Riju Das simply copied her prior stance without conducting any independent review. Das's written responses recycled the language used by Duncan in 2019, ignoring the Complainant's timely filings and precedents under Title VII and Title IX. The combined actions of Duncan and Das demonstrate a pattern of institutional cover-up and deliberate blindness.

134. In April 2018, one year after the original complaint was filed and shortly after the retaliatory dismissal, Duncan instructed the Complainant to submit an amendment, in accordance with Connecticut law, which allows amendments at any time before the case reaches a referee. Eighteen months later, the same attorney claimed that the amendment had to be filed within 180

days, a legally incorrect assertion that constitutes a classic case of equitable estoppel, which CHRO chose to ignore.

135. Between March and September 2020, Attorney Das and CHRO Director Tanya Hughes ignored multiple emails from the Complainant requesting information about the status of the case. They later tried to justify their silence by blaming the COVID-19 pandemic.

136. On September 18, 2020, Attorney Brian Festa lied to protect Das, falsely claiming that the Complainant had filed his Request for Reconsideration late by certified mail, despite knowing that the record was electronic and that Das had received the request on time via email. The Complainant ultimately required the intervention of a state legislator to prevent this abuse from being formalized.

137. In his reopening resolution of January 2021, Principal Attorney Charles Krich ignored all prior irregularities and wrote about Shakespeare, but reaffirmed the legal absurdity that an amendment requires compliance with a 180-day limit, with the sole purpose of shielding Duncan and Das from accountability.

138. During the renewed investigation process in the spring of 2021, Das refused to investigate the retaliatory cancellation of classes and the dismissal, and committed procedural abuse by allowing only the Respondent — and not the Complainant — to question witnesses. However, he ultimately had no choice but to contradict his own 2020 determination and admit that the Complainant was not only the subject of discrimination, but also suffered daily, abusive, and unjustified police intimidation for thirteen consecutive months, which is also prohibited by the Respondent's policy. Das also acknowledged that the Respondent's officials lied under oath.

139. During the OPH proceeding in 2022, Referee Cherron Payne not only allowed the Respondent to file motions to strike and dismiss without addressing the allegedly applicable 180-day limit, but also expressly authorized Attorney Ann Marie Puryear to file a Second Amended

Complaint on February 7, 2022. Despite this formal authorization, catastrophic failures in the investigation led to the case being decertified and remanded for new fact-finding in the spring of 2023, six years after the original complaint was filed.

140. During the most recent investigation conducted by Attorney Renee Vanden Wall Bake, serious errors were committed that now directly impact the current OPH proceeding. The investigator deliberately ignored — once again — that an amendment does not need to be filed within 180 days of a new discriminatory act stemming from the original complaint. She also failed to require the Respondent to meet its burden of proof to justify why the Complainant's classes were canceled and not those of other professors with less seniority and availability. Moreover, she ignored more than 100 documentary exhibits documenting the Complainant's reports of academic corruption, misuse of public funds, and flagrant ethical violations. Even after determining that the termination was retaliatory and had not even been recommended in the Respondent's investigative report, the investigator dismissed the Complainant's request to investigate whether said protected activity was the cause of the termination and avoided acknowledging that CHRO investigators have tacitly conspired with other state officials to cover up these irregularities.

141. This pattern is not new. In October 2019, Yvonne Duncan threatened the Complainant via email, warning him to stop reporting public corruption or risk "angering" the perpetrators and harming his case before CHRO. This threat constitutes an unacceptable abuse of power and an explicit manifestation of corruption within CHRO and other state agencies.

142. The investigator also ignored two documented cases of unequal discipline involving two employees of the Respondent: one at the same Capital Community College, who were reinstated and compensated with back pay despite having been accused of much more serious conduct than that of the Complainant. These cases include Daniel Tauber (for misuse of College email and computer systems) and Christopher Dukes from CCSU (for violent behavior). The flagrant

disparity in the sanctions applied to these employees, compared with the treatment received by the Complainant, completely destroys the Respondent's justification.

143. It was also ignored that the supposed "fear of colleagues" was based on defamatory handwritten letters fabricated by Professor Miriam Mercado, who impersonated other coworkers, an act that constitutes a criminal offense punishable by imprisonment under the Connecticut General Statutes.

144. This OPH proceeding lacks legitimacy. By accepting that an amendment must be filed within 180 days, Referee Payne not only misapplies the law, but contradicts her own binding decisions from 2022, which remain valid because it is the same case, with the same facts, before the same referee. More than 70 exhibits submitted by the Complainant through 2024 were completely ignored, not only by Referee Payne but also by Attorney Trepanier. This systematic disregard for the record has been the defining pattern of the entire proceeding.

145. Referee Payne has stated that she does not favor the Respondent but merely applies the law. With all due respect, that is not true. Throughout all stages of the process, the Respondent has not submitted any substantive evidence — only internal reports, termination letters, and the defamatory handwritten letters fabricated by Professor Mercado. All CHRO investigators, including Referee Payne, accepted those arguments unquestioningly, even though the burden of proof rested with the Respondent. In contrast, more than one hundred pieces of evidence submitted by the Complainant were deliberately ignored.

146. If Referee Payne applied the law fairly, she would recognize that there is no 180-day limit for submitting amendments. She would require the Respondent to support its claims with evidence , and not just legal technicalities and procedural arguments — and would admit that when a collective bargaining agreement exists, discretionary termination is not allowed, a basic principle that Attorney Trepanier also failed to address.

147. The reality is that there can be no due process when these irregularities occur. Everything described here is not interpretation or assumption: these are concrete and verifiable facts supported by overwhelming evidence. This situation should shame the agency, which, instead of accepting responsibility, repairing the harm, and restoring due process, has forced the Complainant to continue participating in an illegal and abusive proceeding.

148. The most alarming aspect of this situation is not only the abuse inflicted on the Complainant but the way in which both CHRO and the Office of the Attorney General have conspired for years to cover up illegal acts committed by other state officials, including serious ethical violations, misappropriation of public funds, and multiple legal infractions.

149. The Complainant has repeatedly notified these abuses to CHRO Executive Director Tanya Hughes, through formal complaints and direct communications. Hughes did not intervene, took no corrective measures, and did not acknowledge the applicability of federal protections under Title IX. Her prolonged inaction and tolerance of abuse at all levels of the agency make her a direct accomplice in the pattern of systematic retaliation and denial of due process suffered by the Complainant.

150. On July 6, 2025, the Complainant filed a Renewed Petition for Decertification, requesting that the case be withdrawn from OPH jurisdiction. This petition summarizes the institutional failures already described and holds that CHRO and OPH are structurally incapable of providing an impartial forum. The petition demands the full restoration of the record, including the excluded amendments and evidence, as a precondition for any legitimate adjudication.

151. On July 10, 2025, the petition was denied.

152. Faced with eight years of obstruction, retaliation, falsification, and coordinated procedural sabotage, on the same day the Complainant has decided to formally withdraw from CHRO

jurisdiction. This step was necessary to preserve his constitutional rights and seek justice in a court where due process, transparency, and equality under the law can be restored.

**COUNT I – TITLE VII: RETALIATION FACILITATED BY DEFENDANT CHRO AND TANYA HUGHES IN HER OFFICIAL CAPACITY AS EXECUTIVE DIRECTOR**

153. The Connecticut Commission on Human Rights and Opportunities (CHRO), acting under color of state law, violated Title VII of the Civil Rights Act of 1964 by enabling, perpetuating, and legitimizing acts of retaliation against the Plaintiff after he engaged in protected activities, including the reporting of workplace discrimination, academic corruption, and misuse of public funds. CHRO's failure to conduct a fair and impartial investigation, its deliberate exclusion of critical evidence, and its invalid retroactive rejection of properly filed amendments effectively deprived the Plaintiff of access to a meaningful remedy under federal law. CHRO accepted federal referrals from the U.S. Department of Education under Title IX and held jurisdiction over claims of discrimination and retaliation, yet refused to acknowledge its responsibilities under these federal protections. By sanctioning retaliatory acts and shielding the Respondent from accountability, CHRO became complicit in the very violations it was mandated to prevent.

**COUNT II – VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983: DEFENDANT CHRO AND TANYA HUGHES IN HER OFFICIAL CAPACITY AS EXECUTIVE DIRECTOR**

154. CHRO officials, including but not limited to Attorneys Yvonne Duncan, Riju Das, Charles Krich, Renee Vanden Wall Bake, Robin Trepanier and Arbitrator Cherron Payne, acted under color of state law to deprive the Plaintiff of rights secured by the Constitution, including the right to due process and equal protection. These officials knowingly excluded amendments that had been formally accepted into the record, ignored binding precedent issued by CHRO itself, and validated a retaliatory termination without investigating the underlying facts or reviewing exculpatory documentation. Investigative decisions were made without independent review,

copied from prior flawed assessments, and consistently favored state actors despite the existence of overwhelming evidence submitted by the Plaintiff. The Office of Public Hearings (OPH) further contributed to the denial of procedural fairness by allowing the Respondent to delay proceedings, to obstruct discovery, and to submit incomplete or misleading evidence without consequence. These acts, committed across multiple years by public officials entrusted with quasi-judicial authority, constitute actionable violations of 42 U.S.C. § 1983.

**COUNT III – CONSPIRACY TO VIOLATE CIVIL RIGHTS UNDER 42 U.S.C. § 1985(3): DEFENDANT CHRO AND TANYA HUGHES IN HER OFFICIAL CAPACITY AS EXECUTIVE DIRECTOR**

155. Defendant Tanya Hughes, and her subordinates, Yvonne Duncan, Riju Das, Charles Krich, Robin Trepanier and Arbitrator Cherron Payne, acting in concert with other state actors and with deliberate disregard for the Plaintiff's federally protected rights, engaged in a coordinated pattern of obstruction and suppression. This conspiracy manifested through repeated refusals to investigate forged documents, systemic exclusion of key factual allegations, protection of fellow state employees from legal accountability, and the manipulation of procedural outcomes to discredit and silence the Plaintiff. The CHRO's internal coordination with the Office of Public Hearings, its pattern of recycling false defenses across cases, and its tolerance of conflicts of interest—such as allowing Attorney Tamara Titre to vote in a matter involving the same Complainant she had previously ruled against—demonstrate intentional collusion designed to deny the Plaintiff a fair hearing.

156. This conduct constitutes a civil rights conspiracy under 42 U.S.C. § 1985(3), aimed at denying the Plaintiff equal protection of the laws and a fair adjudicative process due to his whistleblowing, protected activities, and litigation against the State.

**STATEMENT OF FACTS – MARK WASIELEWSKI (OFFICE OF STATE ETHICS) – 2017-2025**

157. In 2007, Professor Mercado was awarded a state contract from the State School Readiness Program to open a private preschool academy for 72 children by Colón-Rivas, under the concept that Plaintiff would create a bilingual visual arts program for preschoolers. The City was the pass-through entity.

158. Ms. Mercado opened an LLC, *Pequeñín Children Multicultural Readiness Academy, LLC*, being the sole proprietor, and the academy opened its doors in October 2008.

159. Since 2008, Professor Mercado hired as the two adjunct faculties of the CDA Program her Assistant Director–Coordinator at the preschool and the sister of Colón-Rivas. In addition, from 2008–2014, she hired as employees of the preschool academy at least 60 active CDA students and used a portion of their 480 college-mandatory voluntary hours as free labor in her academy.

160. Until she was appointed tenured faculty, Professor Mercado operated simultaneously the CDA Program at Capital and her private academy on a daily basis, and the same was done by the other professors in her department, who functioned as salaried exempt employees and had private businesses during College business hours, such as a psychology clinic, a 24-hour therapy service for law enforcement agents and their families, and multiple teaching appointments in neighboring private colleges, including her Department Chair Dr. Stephen Fagbemi, who was a faculty member at the University of Hartford, CCSU, and operated a practice for addiction treatment in Hartford.

161. All of the above was done with absolute normality and was fully known by President Wilfredo Nieves and HR Director Agnello-Veley, who considered Mercado to be a mentor to her students and her preschool academy to be an extension of the CDA Program that offered students an opportunity to complete their voluntary hours and also for employment.

162. On April 4, 2017, as College management refused to cooperate with the Union, the Plaintiff filed a formal Discrimination Complaint with the CHRO 1710454 –EEOC 16A 2017-00955, and a Complaint with the Office of State Ethics

163. On April 18, 2017, Vice President Weinberger visited Capital Community College in response to an unprecedented number of simultaneous complaints from faculty and staff against the administration. When he asked the Plaintiff why, if he had not harassed or intimidated Professor Mercado, she continued to accuse him, the Plaintiff responded that Mercado's fear that he might disclose serious violations of BOR policies, such as the hiring of CDA students and operating a private company during College business hours, was the only plausible motive behind such serious allegations. VP Weinberger never followed through on his promise to return to Capital with a formal response to the complainants.

164. That same day, April 18, 2017, the Plaintiff published an op-ed article in *The CT Mirror* titled *"Change or Die: A Look at the Other Side of the Truth,"* in which he addressed President Ojakian's consolidation plan and institutional issues within the CSCU system, particularly at Capital Community College. 4Cs Union President Brian Bonina reacted with alarm to the article and falsely accused Dr. Jackson of having instigated the Plaintiff to write it. Although the article used the term "death" on several occasions in a figurative and policy-critical context, no reader expressed concern, nor did anyone interpret the content as threatening or suggestive of violence.

165. On May 18, 2017, the Plaintiff sent a letter via email to BOR–CSCU President Mark Ojakian denouncing the abuses and unethical practices at the College, which were the sole reason behind the retaliation against the Plaintiff. President Ojakian did not respond. When the Plaintiff later received the documents related to his dismissal, on April 19, 2018, it was written that Ojakian, instead of investigating, gave the letter to the perpetrators, which exacerbated the hostile work environment and the retaliation.

166. Between April 2017 and 2025, the Office of State Ethics, and particularly Chief Ethical Enforcement Officer Mark Wasielewski since 2019, acting under color of state law, consistently and deliberately obstructed investigations into documented misconduct and misuse of public funds by senior officials within the Connecticut State Colleges and Universities (CSCU) system. Despite having received hundreds of pages of irrefutable evidence, including official audit findings and whistleblower complaints, Attorney Wasielewski repeatedly either refused to investigate or closed investigations without taking any enforcement action. His conduct reveals a sustained and intentional pattern of cover-up, contributing directly to the ongoing retaliation suffered by the Plaintiff.

167. In multiple separate instances—April 2019, through 2021, March 2022, and again in 2024–2025—Wasielewski received overwhelming documentation detailing ethical violations committed by BOR–CSCU officials, including holding parallel State contracts, hiring of state college students for private businesses, the improper use of federal funds allocated through programs such as Federal Work-Study, Title V, and the Carl D. Perkins CTE Act. These violations included hiring students from the CDA credentialing program to work in a private daycare owned by a college official during regular college hours, a practice that directly contravenes federal financial aid and conflict-of-interest regulations. Despite confirming similar violations in prior enforcement cases for the same exact violations, involving other state employees, Wasielewski refused to act in this matter, falsely asserting a lack of probable cause even after more than two years of review.

168. In a particularly egregious abuse of power, on June 2019, Wasielewski also sent another OSE official, Malissa Hurry, to testify against the Plaintiff in unrelated legal proceedings, effectively weaponizing the ethics enforcement agency against a whistleblower. This act compounded the retaliation and demonstrated Wasielewski's active role in suppressing protected speech and shielding powerful state actors from accountability.

169. Furthermore, Wasielewski's actions—specifically, his repeated failure to investigate, his reliance on knowingly false arguments, and his disregard for his own agency's precedents—directly facilitated the continued misuse of federal education funds, undermined the legitimacy of CDA credentials awarded to state college students, and compromised the integrity of multiple federally supported childcare and workforce development programs.

170. His conduct is not only unethical, but it also implicates federal interests under statutes governing fraud, civil rights, and the misuse of U.S. Department of Education and Department of Health and Human Services funds. The Plaintiff reserves all rights to pursue federal remedies against Attorney Wasielewski in his individual and official capacities for his role in the conspiracy to retaliate, obstruct justice, and deprive the Plaintiff of constitutionally protected rights.

**COUNT I – TITLE VII: RETALIATION FACILITATED BY THE OFFICE OF STATE ETHICS AND ATTORNEY MARK WASIELEWSKI**

171. The Office of State Ethics, through the deliberate actions of Attorney Mark Wasielewski, violated Title VII of the Civil Rights Act of 1964 by retaliating against the Plaintiff for engaging in protected activities, including filing whistleblower complaints and reporting systemic discrimination and academic corruption. Instead of impartially investigating credible evidence of misconduct by state officials, Attorney Wasielewski weaponized his office to protect powerful actors and to suppress the Plaintiff's protected speech. This included the decision to send a subordinate agency official to testify against the Plaintiff in unrelated proceedings, knowing the Plaintiff was a whistleblower and civil rights complainant. By failing to carry out its enforcement duties and by actively aiding retaliatory actions, the Office of State Ethics undermined the protections guaranteed by Title VII and contributed materially to the Plaintiff's ongoing injury.

**COUNT II – VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983: OFFICE OF STATE ETHICS AND ATTORNEY MARK WASIELEWSKI**

172. Attorney Mark Wasielewski, acting under color of state law and in his capacity as Chief Enforcement Officer, deprived the Plaintiff of constitutional rights, including the right to petition the government for redress, the right to due process, and the right to equal protection. Despite being presented with overwhelming and repeated evidence of ethical violations and misuse of federal funds, Attorney Wasielewski closed multiple investigations without action, gave knowingly false justifications, and protected colleagues from scrutiny. His conduct enabled the perpetuation of institutional misconduct and directly contributed to the retaliatory environment that harmed the Plaintiff. These actions, taken over several years and reinforced through agency silence and procedural obstructions, constitute actionable civil rights violations under 42 U.S.C. § 1983.

**COUNT III – CONSPIRACY TO VIOLATE CIVIL RIGHTS UNDER 42 U.S.C. § 1985(3): OFFICE OF STATE ETHICS AND ATTORNEY MARK WASIELEWSKI**

173. Attorney Mark Wasielewski, in coordination with other state officials, engaged in a deliberate conspiracy to retaliate against the Plaintiff and to obstruct his access to fair governmental review. This conspiracy was manifested through the systematic suppression of investigations, selective enforcement, and collusion with other agencies to conceal wrongdoing. The decision to send Malissa Hurry to testify against the Plaintiff—while ignoring enforceable ethics violations by other state employees—exemplifies the use of institutional authority to suppress a whistleblower. These coordinated acts were motivated by discriminatory animus against the Plaintiff's protected conduct and constituted a pattern of intentional deprivation of rights, in violation of 42 U.S.C. § 1985(3).

**CITY OF HARTFORD AND OFFICE OF EARLY CHILDHOOD: INSTITUTIONAL RETALIATION, FRAUD COVER-UP, AND FAILURE TO INVESTIGATE (2011–2025)**

174. From the outset, Ms. Mercado declared that the income from the State Care4Kids Program constituted her personal profit, which she used freely for various personal expenses. This

arrangement continued throughout the years Plaintiff worked for the program and was fully known to the supervising professionals and officers at every level. Despite this, all financial reports and annual audits were consistently approved, and public funding flowed without interruption.

175. In 2011, the LLC was converted into an S-Corporation, with Ms. Mercado as sole shareholder. In 2012, following her transition from a full-time administrative role to a tenured faculty position, she dismissed MacKeena & Associates and began managing the academy directly, assisted by CPA Miguel Correa.

176. In 2014, the Plaintiff and Ms. Mercado decided to divorce. To undermine the divorce proceedings and intimidate the Plaintiff, Ms. Mercado launched a series of false accusations: she claimed that the Plaintiff had abused and harassed female coworkers and families at the academy, committed check fraud and theft, received a salary without working, misused project materials, and committed domestic violence. These claims led to unjustified police interventions and arrests. At one point, the family court-appointed mediator—a former Superior Court Judge—openly threatened to refer the Plaintiff to a federal prosecutor. None of the accusations ever materialized in court, and no restraining order requested by Mercado was ever granted.

177. In response to the court's request for a financial disclosure, the Plaintiff hired independent CPA Marlenys Mesta of West Hartford. Upon reviewing the documents, Ms. Mesta found that in FY 2014 alone, Ms. Mercado had diverted $254,630.00 in salary, legal fees, personal travel, shareholder loans, distributions, and retained earnings. Alarmed, Ms. Mesta stated that such use of public funds for corporate profit was impermissible, particularly under the Care4Kids program. She advised the Plaintiff to preserve relevant records and familiarize himself with applicable regulations. Although Ms. Mesta met with Plaintiff's attorney, they ultimately withheld the report from the court in favor of reaching a settlement.

178. On April 2, 2014, Plaintiff was dismissed from the academy. Soon after, Colón-Rivas canceled his annual Family Fair mural contract, and the murals he had created with the community were removed from Hartford City Hall and recreation centers.

179. The divorce was finalized in June 2015. As part of the settlement, the Plaintiff was prohibited from speaking about Ms. Mercado, her private academy, or her employment at Capital Community College under penalty of contempt.

180. In mid-2015, Ms. Mercado dismissed her academy's Assistant Director, Luisa Rivera, after secretly recording her with a hidden cellphone. Mercado then accused Rivera—just as she had accused Plaintiff—of workplace violence. Rivera later filed formal complaints with the City of Hartford and the Office of Early Childhood, citing embezzlement of public funds and misconduct, and submitted a separate complaint to President Nieves regarding unethical hiring practices and misuse of college hours.

181. These complaints triggered several investigations. However, Colón-Rivas and President Nieves intervened to shield Mercado and obstruct any accountability—partly to protect themselves. The Plaintiff cooperated when requested, but was falsely accused of having instigated or conspired with Ms. Rivera, a claim that Mercado failed to prove in two separate court proceedings held in 2018 and 2019. Plaintiff did not become aware of this accusation until April 18, 2018, when he received the Investigative Report used to justify his dismissal.

182. In September 2016, Plaintiff was fully exonerated in a DCF investigation into alleged violent conduct toward children at the academy, after several female co-workers submitted sworn affidavits discrediting the claims.

183. At the end of 2017, the Plaintiff was selected by popular vote for a mural contract in Hartford as part of the *Hartford Paints the City* project, which was even featured in the *Hartford Courant*. Although he was paid both the initial deposit and the final payment, Colón-Rivas never responded

to the Plaintiff's requests to make arrangements for the installation of the mural on the facade of the Burns School in Hartford. To this day, the mural remains stored away in a storage unit.

184. On November 18, 2018, Honorable Margaret Murphy ruled on favor of Plaintiff after a trial on October 25, 2018, then Ms. Mercado filed a new lawsuit at Civil Court.

185. In 2019, at the Superior Civil Court, Ms. Mercado demanded $150,000 in compensation if the Plaintiff did not admit to having defamed her, which the Plaintiff refused. Simultaneously, intimidating actions began to occur: the Plaintiff's apartment was broken into by forcing the lock, yet nothing of value was stolen; his cars were vandalized, and individuals intimidated the Plaintiff's new wife by simulating chases in traffic. The Hartford Police did not even file a police report, claiming there was no suspect. After a confrontation with OSE Michael Morrissey who threatened the Plaintiff, and when shots were fired at the cars, the Plaintiff contacted the FBI.

186. Around May 1, 2019, the Plaintiff met with FBI Special Agent Ron Offutt and provided him with all documentation in his possession, including evidence of misuse of funds, ethical violations, and academic corruption. Agent Offutt stated that investigating higher education was extremely difficult and not within the FBI's primary jurisdiction, suggesting instead that it was the responsibility of the State of Connecticut to investigate misuse of funds. He referred the Plaintiff back to state authorities, after which the Plaintiff contacted the State Auditors of Public Accounts.

187. From June 5 to August 16, 2019, the Plaintiff sent State Auditor Ramona Weingart two hundred and twenty emails containing all documents in his possession related to the use of funds in Hartford preschool programs, as well as all evidence previously submitted to the Office of State Ethics. These emails were also copied to Agent Offutt, Office of Early Childhood Director Beth Bye, and multiple officials from the City of Hartford, primarily Chief Auditor Craig Trujillo.

188. After Ms. Mercado's attorney learned during a civil court pre-trial conference that the Plaintiff had contacted the FBI, the acts of intimidation ceased.

189. On June 25, 2019, a trial was held in Superior Civil Court regarding the defamation lawsuit referenced by Human Resources Director Josephine Agnello-Veley in her "Investigative Report."

190. One of the witnesses subpoenaed by Professor Mercado's attorney testified that she had been a student in the CDA program at Capital Community College, where Professor Mercado had been her instructor. She stated that in 2010, after completing part of her 480 volunteer practicum hours at Professor Mercado's private academy without any compensation, she was hired by Mercado as an employee. The witness further testified that she graduated from the CDA program after passing her final practicum at the same academy in 2012, and noted that several classmates had also been hired under similar circumstances. Additionally, she declared that her sister's personal information and academic credentials—her sister also a graduate of the Capital CDA program—appeared in official reports submitted by Professor Mercado to the Connecticut Office of Early Childhood as if her sister had been employed at the academy, when in fact she never worked there.

191. Another witness, a contractor who had performed maintenance work at Professor Mercado's private academy, testified that in 2015–2016, she paid him with a check drawn from state funds assigned to the academy, as compensation for installing a vinyl fence at Professor Mercado's private residence. According to his testimony, to justify the payment, Professor Mercado submitted a fake invoice referencing a maintenance job he had completed at the academy ten years prior, presenting it as if it had been recently performed.

192. The same witness submitted an affidavit to the court, in which he affirmed that the response given by Professor Mercado to the Office of Early Childhood in October 2016, regarding the payments made to him for maintenance services, was completely false.

193. During the hearing, Chief Auditor Craig Trujillo confirmed that the Plaintiff had not been involved in the 2015 whistleblower complaint of Ms. Rivera, and Mercado's Attorney presented

the memorandum Trujillo had sent to José Colón-Rivas, asserting that the presence of a CPA (Correa) and an auditor (Nardone) indicated that everything was in order.

194. Auditor Trujillo heard Mercado respond to the judge by claiming that the Care4Kids funds were her unregulated earnings, and also heard the testimony of the contractor who installed the fence in 2016, yet took no action. Later, during a meeting of the Hartford Audit Commission, Trujillo reiterated what he had stated in his 2016 memo, insisting that everything was in order and that no further investigation was necessary.

195. The Plaintiff received no response or communication from Commissioner Beth Bye or from State Auditor Ramona Weingart.

196. The trial decision entirely omitted the testimony of both witnesses and, among multiple allegations, concluded that only the October 2017 email was defamatory—even though that email was never mentioned during the trial and Mercado, who bore the burden of proof, presented no evidence to counter the Plaintiff's affirmative defense.

197. On January 2021, after receiving the transcript of the 2019 trial, Plaintiff contacted Auditor Kimberly Nardone to inform her that, based on his own investigation and what had transpired during the trial, something was wrong with the audits she had conducted and that this needed to be corrected. Auditor Nardone did not respond.

198. On May 3, 2021, State Senator Edwin Vargas learned that the State Auditors had never responded to Plaintiff and reached out to State Auditor John Geragosian, who contacted Plaintiff and agreed to resume the investigations.

199. Once again, from September 26, 2021 to May 10, 2023, Plaintiff provided in an organized manner all documents in his possession regarding both the ethical violations and the preschool program. Auditor Craig Trujillo, OEC Commissioner Beth Bye, and other city and state officials were copied on some of the emails.

220. Commissioner Bye in particular received multiple emails with attached documents from May 4, 2021 to August 8, 2023. Ms. Bye never responded.

221. On November 30, 2021, the Plaintiff filed a formal complaint regarding these issues, retaliation and abuse of authority across several state agencies with the Office of the State Attorney General (SAG) and received a response from Deputy State Attorney General Sandra Arenas, who stated that those matters would be addressed by the State Auditors and by CHRO.

222. On August 8, 2023, the Plaintiff submitted the "Petition to CHRO – CastroCruz v BOR-CCC-2017," which included detailed documentation of years of cover-up and retaliation involving multiple agencies, including the Office of Early Childhood and the Hartford School Readiness Council. Commissioner Beth Bye, who had already been receiving emails with attached evidence since May 2021, took no action.

223. On November 14, 2023, the Plaintiff renewed his complaints before the Office of State Ethics and the State Auditors, explicitly including the Office of Early Childhood as part of the institutional cover-up. He emphasized that OEC continued to approve public funding for the Pequeñín program despite prior findings and extensive documentation.

224. Around March 2024, the State Auditors finalized their review through Fiscal Year 2024. However, no findings were disclosed regarding the Office of Early Childhood or Pequeñín CMRA, LLC. The agency invoked alleged confidentiality provisions as justification for not publishing any conclusions related to those matters.

225. On March 22, 2024, Plaintiff sent letters to several State officials, including the State Auditors, Commissioner Bye, and leaders of CGA and once again requested proper investigation. There was no response.

226. On March 22, 2024, the Plaintiff also contacted the new Hartford Mayor, Arunan Arulampalam, and expressed his willingness to discuss the whereabouts of the murals he had

created over the years, which had been removed from City Hall, the 2018 mural that was never installed, and the issues surrounding the program's funding. Several City Officials, including Auditor Trujillo, as well as Commissioner Bye, were included in the email. No official responded.

227. Throughout 2024 and continuing into 2025, the Office of Early Childhood, under the leadership of Commissioner Beth Bye, continued to approve and disburse public funds to Pequeñín CMRA, LLC, despite having received cumulative evidence since 2019 documenting fraud, embezzlement, and violations of mandatory criminal background check requirements. Nevertheless, Commissioner Bye failed to initiate any investigation, issue a public statement, or refer the matter to the State Attorney's Office.

228. In early 2025, a preschool owner who had been accused of misusing Care4Kids funding contacted the Plaintiff and asked him about the common practice of treating Care4Kids funding as profit, not only at Pequeñín CMRA but across other City-funded programs. The Plaintiff agreed to cooperate with her, recognizing that a clear double standard was being applied in the investigation against her.

229. On January 29, 2025, the Plaintiff was invited to a meeting with Ms. Kristina Baldwin, the new Director of Children, Families, Youth and Recreation for the City of Hartford, along with several members of her staff. During the meeting, the Plaintiff shared his experience and confirmed that it was indeed a widespread practice, during Colón-Rivas's tenure, for preschool programs funded by the City to treat Care4Kids funding as business profit. Ms. Baldwin appeared surprised, despite the fact that she had also been included in the March 2024 email.

230. The Plaintiff explained that a proper investigation and clarification of this issue could help exonerate him from false accusations and assist in overcoming the ongoing retaliation he had been subjected to.

231. Once again, on February 12, 2025, the Plaintiff emailed Director Baldwin, reiterating that resolving the issue would have a positive impact on his efforts to clear his name.

232. In the following days, the Plaintiff submitted documentation to support his statements. He provided Ms. Baldwin—and copied Mayor Arulampalam—on several emails containing evidence. As agreed during the meeting, on February 20, 2025, the Plaintiff delivered to Director Baldwin a USB drive containing multiple documents that substantiated his claims.

233. On March 12, 2025, Ms. Shyleen Lopez, Assistant Director to Ms. Baldwin, sent a letter to the accused woman and her husband, thanking them and the Plaintiff for the meeting and for presenting the information and evidence, which they claimed to have reviewed—only to conclude that no action was necessary. The Plaintiff never received a copy of that letter.

234. On July 10, 2025, Plaintiff sent an email to officials from the City of Hartford and the Office of Early Childhood, including Mayor Arunan Arulampalam and Commissioner Beth Bye, attaching the City's letter regarding the alleged misuse of Care4Kids funds. The letter, was never previously sent to the Plaintiff, following their meeting with City officials and the Plaintiff earlier that year.

**COUNT – JOSÉ COLÓN-RIVAS (2014–2018)**

**CAUSE OF ACTION: 42 U.S.C. § 1983 – RETALIATION & ABUSE OF AUTHORITY**

235. Defendant José Colón-Rivas, former Director of the City of Hartford's Department of Families, Children, Youth and Recreation, engaged in repeated acts of retaliation, obstruction, and misuse of public authority. After Plaintiff's dismissal from Mercado's academy in 2014, Colón-Rivas abruptly canceled Plaintiff's mural contract and removed publicly funded community artwork from City Hall and recreation centers. In 2015–2016, when formal complaints about Ms. Mercado's misuse of funds and unethical practices emerged, Colón-Rivas intervened to shield her from investigation. He falsely attributed whistleblower activity to Plaintiff and allowed intimidation tactics to continue. Despite receiving direct reports of embezzlement and fraud,

Colón-Rivas took no corrective action and instead penalized Plaintiff by denying future contracts, thus violating Plaintiff's rights under Title VII and §1983.

**COUNT – CRAIG TRUJILLO (2016–2024)**

**CAUSE OF ACTION: 42 U.S.C. § 1983 –WILLFULL OBSTRUCTION & DENIAL OF DUE PROCESS**

236. Defendant Craig Trujillo, Chief Auditor for the City of Hartford, knowingly facilitated the institutional cover-up of financial misconduct. In 2016, he received complaints and internal memos about Mercado's use of public funds for private gain but dismissed them, claiming audits were "in order." During a 2019 court hearing, he heard sworn testimony about false invoices and misuse of Care4Kids funds, yet reaffirmed his earlier memo shielding Mercado. From 2019 to 2024, he was repeatedly copied on emails containing extensive evidence of fraud and retaliation but refused to initiate any inquiry. Trujillo's conscious failure to act deprived Plaintiff of due process and contributed directly to the continuation of retaliation in violation of §1983.

**COUNT – ARUNAN ARULAMPALAM (2024–2025)**

**237. CAUSE OF ACTION: 42 U.S.C. § 1983 –PERPETUATION OF INSTITUTIONAL RETALIATION**

Defendant Arunan Arulampalam, Mayor of Hartford since 2024, perpetuated the City's long-standing pattern of institutional corruption by ignoring direct reports from Plaintiff regarding misuse of public funds, removal of public murals, and ongoing retaliation. Despite receiving emails, documentation, and invitations to meet, Mayor Arulampalam failed to respond or take any corrective action. His inaction not only enabled the continued cover-up of previous misconduct under his administration but also contributed to Plaintiff's ongoing harm, violating his constitutional rights under §1983.

**COUNT – KRISTINA BALDWIN (2024–2025)**

**CAUSE OF ACTION: 42 U.S.C. § 1983 –RETALIATORY INDIFERENCE & OBSTRUCTION**

238. Defendant Kristina Baldwin, Director of Children, Families, Youth and Recreation for the City of Hartford, knowingly disregarded compelling documentation submitted by Plaintiff in 2024 and 2025 regarding fraud in the Care4Kids program and systemic retaliation. Although Baldwin initially expressed interest during a meeting, and received follow-up evidence via email and USB drive, she failed to take appropriate action. The City, under her supervision, issued a vague, dismissive response to whistleblowers, including Plaintiff, without further inquiry. Her willful indifference to the evidence and refusal to act constitutes deliberate obstruction and retaliation, in violation of Plaintiff's rights under §1983.

**COUNT – CONSPIRACY UNDER 42 U.S.C. § 1985(3)**

**CAUSE OF ACTION: 42 U.S.C. § 1985(3) – CONSPIRACY TO OBSTRUCT JUSTICE & RETALIATE AGAINST PROTECTED SPEECH**

239. From at least 2016 through 2025, Defendants José Colón-Rivas, Craig Trujillo, Arunan Arulampalam, Kristina Baldwin, and Beth Bye engaged in a coordinated course of conduct to conceal widespread misuse of public funds, retaliate against whistleblowers, and suppress Plaintiff's protected activity. Each received direct complaints and documentary evidence, yet failed to investigate, respond, or act. Their conduct reflects a tacit agreement to protect those implicated in fraud and to marginalize and punish Plaintiff for speaking out. This joint refusal to uphold the law, combined with acts of intimidation and obstruction, constitutes a civil conspiracy under §1985(3) aimed at depriving Plaintiff of equal protection and due process under the law.

**COUNT — VIOLATION OF CIVIL RIGHTS UNDER 42 U.S.C. § 1983**

**DEFENDANTS: OFFICE OF EARLY CHILDHOOD AND COMMISSIONER BETH BYE**

240. Between 2019 and 2025, Defendant Beth Bye, as Commissioner of the Office of Early Childhood (OEC), willfully ignored overwhelming documentary evidence of fraud, misuse of public funds, and systemic retaliation involving the Pequeñín CMRA program. Despite being repeatedly notified through dozens of emails with attachments from the Plaintiff—including sworn affidavits, CPA reports, contractor testimony, and public audit inconsistencies—Commissioner Bye failed to act, disclose findings, or refer the matter to the State Attorney's Office.

241. OEC continued approving and disbursing public funding to Pequeñín CMRA, LLC, even after it had been shown that the academy operated with falsified records, hired CDA students without pay to satisfy degree requirements, submitted false invoices, and used public money for private property improvements. This conduct violates the Plaintiff's constitutional rights under the Due Process Clause by perpetuating state-sponsored retaliation and shielding a private actor (Mercado) whose actions had already caused unlawful dismissals, false arrests, and career damage.

242. The failure of OEC to investigate, disclose, or act on years of documented abuse and fraud constitutes a deliberate indifference to the Plaintiff's rights and a breach of its statutory duty to safeguard public preschool funds.

**COUNT — CONSPIRACY TO VIOLATE CIVIL RIGHTS UNDER 42 U.S.C. § 1985(3) DEFENDANTS: BETH BYE, JOSE COLÓN-RIVAS, CRAIG TRUJILLO, KRISTINA BALDWIN, AND ARUNAN ARULAMPALAM**

243. Defendant Beth Bye knowingly joined an ongoing institutional conspiracy to suppress evidence of misconduct, retaliate against the Plaintiff, and protect the financial and political interests of other public officials—including Colón-Rivas, Trujillo, Baldwin, and Arulampalam. Despite her statutory authority to audit and suspend early childhood programs receiving public

funds, Bye acted in concert with municipal and state officials to obstruct investigations and discredit whistleblowers.

244. Commissioner Bye ignored hundreds of documented communications since 2019, refused to respond to the Plaintiff's inquiries, and failed to intervene even after being directly notified of fabricated invoices, unauthorized use of student records, fraudulent CDA certifications, and retaliation against Luisa Rivera and the Plaintiff. She also failed to respond to direct requests for intervention made by State Senator Edwin Vargas in 2021.

245. This coordinated inaction, in tandem with the City of Hartford's own obstruction, enabled continued retaliatory acts against the Plaintiff and preserved the operation of a fraudulent program funded with taxpayer money. Such coordinated indifference and protection of known misconduct constitutes a conspiracy to deprive the Plaintiff of equal protection under the law in violation of § 1985(3).

**STATEMENT OF FACTS – SBLR CASE SPP-34,351**

246. On January 19, 2021, the Plaintiff filed a formal complaint before the Connecticut State Board of Labor Relations (SBLR) against his employer, the Board of Regents for Higher Education (BOR–CSCU), alleging that Capital Community College (CCC) officials had retaliated against him and wrongfully terminated his employment. At that time, the newly elected union president, Seth Freeman, initially expressed support for the Plaintiff's claims. However, after the proceedings began, Freeman abruptly withdrew that support without explanation. As a result, the Congress of Connecticut Community Colleges (4Cs – SEIU Local 1973), which had failed to represent the Plaintiff during the events leading to his termination, was added as a Respondent. The Plaintiff alleged that the union's inaction and refusal to challenge false and defamatory accusations contributed directly to his dismissal and that union officials had colluded with CCC management to facilitate his unlawful termination.

247. SBLR assigned Attorney Jose Santana to review the complaint. Although Santana initially stated that the complaint appeared untimely under the six-month limitations rule, he decided to allow the case to proceed due to the seriousness of the claims and because newly elected union president Seth Freeman initially expressed willingness to support the Plaintiff's allegations.

248. On April 21, 2021, the Plaintiff amended the complaint to add new claims against CCC for retaliatory conduct and against the Board of Regents for Higher Education (BOR–CSCU) for failure to monitor union conduct and for contractual violations. On June 1, 2021, the SBLR consolidated all pending claims under docket number SPP-34,351, including grievances filed in 2020 and 2021.

249. Between April 2021 and May 2022, the Plaintiff submitted hundreds of pages of documentary evidence to Attorney Santana, including emails, transcripts, and institutional documents that demonstrated retaliatory actions, suppression of whistleblower complaints, and union complicity in fabricating misconduct narratives. Despite this, Santana dismissed the case on May 5, 2022, citing lack of sufficient evidence.

250. The Plaintiff promptly filed an objection, pointing out that critical evidence had been ignored. On June 8, 2022, the Board accepted the objection and reopened the case, recognizing that key factual disputes required adjudication in a public hearing.

251. The case was defended to Attorney Sarah Skubas of Jackson Lewis P.C., who represented the BOR–CSCU and Attorney Erich Chester for the Union. On November 30, 2022, Skubas introduced the fabricated handwritten letters as evidence, despite seeing that the letters were fabricated. Afterward, she declined to withdraw them. These letters were subsequently republished in the Board's December 2023 decision, amplifying the defamatory harm to Plaintiff.

252. Throughout the public hearings, the Plaintiff faced severe procedural obstacles. Attorney Frank Cassetta, legal counsel for the SBLR, systematically obstructed Plaintiff's ability to present

material witnesses, including key figures such as union representative Waynette Arnum and CCC administrator Josephine Agnello-Veley. He also excluded relevant rebuttal documents and tolerated perjured testimony by Wilfredo Nieves and Paula DeBarros. Cassetta refused to allow Plaintiff to present contradicting documents or call rebuttal witnesses in response to false statements made under oath.

253. A particularly egregious example involved SBLR Organizer Greg Jackson, who testified that he did not file a grievance because the Plaintiff had already filed a CHRO complaint. However, Plaintiff sought to introduce written evidence that Jackson himself had advised filing a CHRO complaint instead of a grievance. Cassetta excluded this evidence, denying Plaintiff the opportunity to rebut Jackson's testimony.

254. Jackson's testimony was also materially compromised due to his involvement in a confidential settlement agreement with the 4Cs union, which he feared might be violated by testifying fully. He claimed memory loss about key facts previously disclosed in a 2021 CHRO affidavit, including his admission that Union President Brian Bonina had prohibited him from representing the Plaintiff.

255. Cassetta's conduct throughout the proceedings reflected a pattern of procedural bias. He excluded multiple items of rebuttal evidence without legal justification, allowed false narratives to dominate the record, and issued a final ruling that endorsed fabricated documents and ignored extensive documentation of retaliation and constitutional violations.

256. These proceedings were tainted by a failure to observe due process, a suppression of key factual evidence, and a pattern of collusion between the union, the employer, and agency officials. The final ruling by the Board upheld retaliatory conduct based on falsified records and severely harmed the Plaintiff's reputation, livelihood, and access to fair adjudication.

**COUNT ONE BREACH OF DUTY OF FAIR REPRESENTATION**

**(Against Congress of Connecticut Community Colleges – 4Cs / SEIU Local 1973)**

257. The Congress of Connecticut Community Colleges (4Cs – SEIU Local 1973) was, at all relevant times, the exclusive collective bargaining representative for full-time faculty and professional staff employed at Capital Community College. Under *Vaca v. Sipes*, 386 U.S. 171 (1967), the 4Cs owed Plaintiff a duty of fair representation in all matters governed by the collective bargaining agreement (CBA). Between 2016 and 2018, union officers and representatives—including Brian Bonina, Greg Jackson, and Waynette Arnum—failed to represent the Plaintiff fairly, acted with deliberate indifference to his reports of workplace harassment and false accusations, and obstructed his access to contractual protections.

258. Rather than initiating a grievance or supporting Plaintiff's repeated requests for intervention, the union refused to act, despite having full knowledge of the fabricated allegations and retaliatory environment. Organizer Greg Jackson falsely stated in subsequent administrative proceedings that no grievance was filed because Plaintiff had already gone to CHRO, when in fact Jackson himself had advised that strategy. Meanwhile, union president Brian Bonina explicitly prohibited Jackson from representing Plaintiff, and Arnum declined to act on Plaintiff's behalf even while serving on the college's Sexual Misconduct Prevention Committee.

259. In later proceedings before the State Board of Labor Relations (SBLR), the union did not challenge the introduction of forged evidence, failed to refute false testimony, and withheld support that was essential to Plaintiff's defense. The union's failure to represent the Plaintiff adequately, combined with its active role in enabling institutional retaliation, constitutes a clear breach of its legal and contractual obligations under the CBA and federal labor law.

**COUNT TWO VIOLATION OF 42 U.S.C. § 1983**

**(Against Congress of Connecticut Community Colleges – 4Cs, Brian Bonina, Greg Jackson, Waynette Arnum in their individual and official capacities)**

260. At all relevant times, the Congress of Connecticut Community Colleges and its agents acted under color of state law as a certified exclusive bargaining representative within a public employment system governed by Connecticut law. Through their positions of authority, Defendants Brian Bonina, Greg Jackson, and Waynette Arnum knowingly violated the Plaintiff's constitutional rights, including his right to petition for redress, due process protections, and equal treatment under the law.

261. Specifically, Bonina ordered Jackson not to represent Plaintiff despite Plaintiff's vulnerable and retaliated-against status. Jackson obeyed this directive, failed to initiate any formal grievance, and later offered misleading and evasive testimony before CHRO and SBLR. Arnum, while holding a dual role as union steward and member of CCC's Sexual Misconduct Prevention Committee, cooperated with college management in sustaining police surveillance and institutional hostility against the Plaintiff despite having no basis to believe he was a threat.

262. These actions, taken in concert and under the color of state authority, directly contributed to the denial of Plaintiff's constitutional protections and culminated in his retaliatory dismissal, prolonged blacklisting, and the suppression of key evidence during administrative hearings.

**COUNT THREE VIOLATION OF 42 U.S.C. § 1985(3)**

**(Against Congress of Connecticut Community Colleges – 4Cs, Brian Bonina, Greg Jackson, Waynette Arnum, Attorney Sarah Skubas, Wilfredo Nieves, Josephine Agnello-Veley, Paula DeBarros, and Frank Cassetta)**

263. Defendants engaged in a conspiracy to retaliate against Plaintiff for exercising his protected rights, including whistleblowing, union advocacy, and formal reporting of academic and institutional misconduct. In furtherance of this conspiracy, Defendants jointly obstructed Plaintiff's access to fair proceedings, coordinated the suppression of exculpatory evidence, and promoted demonstrably false narratives intended to justify unlawful termination and reputational harm.

264. Defendant Bonina prohibited Plaintiff from receiving union representation. Jackson, acting under pressure and pursuant to a confidential settlement with the union, gave evasive testimony in fear of violating non-disclosure provisions. Arnum knowingly supported college actions against Plaintiff while refusing to intervene. Attorney Sarah Skubas introduced fabricated handwritten letters into evidence during administrative proceedings, despite knowing they were forgeries, and refused to remove them after repeated warnings. Frank Cassetta, in his role as SBLR counsel, denied Plaintiff the opportunity to call essential witnesses, blocked rebuttal evidence, tolerated perjured testimony, and upheld a rigged evidentiary process.

265. Meanwhile, Wilfredo Nieves, Josephine Agnello-Veley, and Paula DeBarros directly participated in the propagation of defamatory statements, abuse of authority, and cover-up of fabricated materials, all in collaboration with union officials and state counsel. The combined actions of these parties were driven by a shared objective to punish the Plaintiff, conceal misconduct, and deprive him of equal protection under the law, in violation of 42 U.S.C. § 1985(3).

**COUNT FOURDEFAMATION**

**(Against Wilfredo Nieves, Josephine Agnello-Veley, Paula DeBarros, Attorney Sarah Skubas, and Attorney Frank Cassetta, in their personal capacities)**

266. Defendants Wilfredo Nieves, Josephine Agnello-Veley, and Paula DeBarros knowingly or recklessly participated in the creation, dissemination, or validation of false and defamatory handwritten letters attributing violent, erratic, or threatening behavior to the Plaintiff. These letters

were later introduced into formal proceedings despite the absence of any credible authorship or corroboration, and despite existing evidence that Plaintiff was the target of fabricated accusations.

267. Attorney Sarah Skubas, acting on behalf of the Board of Regents, formally submitted the forged documents into the evidentiary record of the SBLR case in November 2022. Although notified multiple times by Plaintiff that the documents were fabrications, Skubas refused to withdraw them, and instead relied upon them to justify the state's position in administrative litigation. Her conduct resulted in the republication of defamatory material through the agency's official ruling in December 2023.

268. Attorney Frank Cassetta, acting in his individual capacity during the hearings, accepted the forged evidence without scrutiny, blocked Plaintiff from presenting rebuttal materials, and permitted perjured testimony regarding the letters to remain unchallenged. His actions, taken knowingly and without neutral justification, furthered the spread of defamatory content and materially injured Plaintiff's reputation, career, and mental health.

269. Each Defendant acted with actual malice or reckless disregard for the truth, and their actions resulted in public injury, professional harm, emotional distress, and reputational damage to the Plaintiff.

## PRAYER FOR RELIEF

**WHEREFORE,** the Plaintiff respectfully requests that this Honorable Court grant the following relief:

1. A **judicial declaration** that the Defendants violated the Plaintiff's constitutional, statutory, and contractual rights, including but not limited to his rights under Title VII of the Civil Rights Act of 1964, the First and Fourteenth Amendments to the United States Constitution (pursuant to 42 U.S.C. § 1983), and protections against retaliation for reporting corruption and discrimination;

2. A **declaration** that the actions of the Defendants constituted an unlawful conspiracy to interfere with the Plaintiff's civil rights under 42 U.S.C. § 1985(3), as well as gross institutional negligence and collusion to conceal and perpetuate institutional retaliation;

3. An **injunctive order** prohibiting the Defendants from further disseminating, invoking, or using the fabricated handwritten letters in any administrative or judicial proceeding, and ordering their immediate removal from all public and official records in which they were included, including decisions issued by CHRO and the State Board of Labor Relations (SBLR);

4. An award of **full compensatory damages** for the harm suffered by the Plaintiff, including loss of employment, loss of income, harm to his reputation, emotional distress, loss of artistic and professional development, loss of quality of life over more than ten years, as well as loss of future opportunities and continuing harm, in an amount to be determined by a jury at trial;

5. An award of **punitive damages** against those Defendants sued in their individual capacities whose conduct reflected malice, bad faith, deliberate falsehoods, or reckless disregard for the Plaintiff's rights, including but not limited to José Colón-Rivas, Josephine Agnello-Veley, Wilfredo Nieves, Paula DeBarros, Sarah Skubas, Frank Cassetta, and others who acted under color of law;

6. A **declaratory and equitable order** requiring the institutional and official Defendants to implement effective mechanisms of oversight, accountability, and protection against retaliation within the public college system (BOR–CSCU), CHRO, the State Ethics Office, and other implicated agencies;

7. **Specific restitution** of the Plaintiff's former mural contract with the City of Hartford, including reinstatement of his role as a community muralist and art educator, and priority inclusion in future publicly funded projects for children, the arts, and cultural diversity;

8. An award of **additional compensation** under any other applicable federal or state law, including breach of contractual obligations under collective bargaining agreements and violations of statutory ethical duties;

9. An award of **costs of litigation, attorney's fees, and other reasonable legal expenses**, pursuant to 42 U.S.C. § 1988 and other relevant provisions;

10. Any other **relief that this Honorable Court deems just and proper**.

**THE PLAINTIFF CLAIMS A TRIAL BY JURY AS A MATTER OF RIGHT**

**THE PLAINTIFF**

____________________________________

Humberto Castro Cruz
Self-Represented
44 Brittany Farms Rd. K-318
New Britain, CT, 06053
(860)-805-7567
hckruz@hushmail.com